Dr. Sharon JOHNSON, Plaintiff,

v.

UNIVERSITY OF PITTSBURGH et al.

Civ. A. No. 73–120.

United States District Court,
W. D. Pennsylvania.

June 4, 1973.

Sylvia Roberts, Baton Rouge, La., Dianne M. Faber, Edwin J. Martin, Pittsburgh, Pa., for plaintiff.

Charles C. Arensberg, Pittsburgh, Pa., for defendants.

KNOX, District Judge.

The court, having taken testimony and considered the evidence presented on both sides and the briefs and arguments of counsel, makes the following findings of fact and conclusions of law with discussion setting forth the reasons therefor, as follows:

## FINDINGS OF FACT

(1) Plaintiff was employed in 1967 for three years as Assistant Professor without tenure in the Department of Biochemistry of the School of Medicine at the University of Pittsburgh at a salary of $13,000 per year.

(2) At the time of her employment, plaintiff was advised by the Chairman of the Biochemistry Department that the requirements for securing tenure within 6 years were research and membership in the American Society of Biological Chemists. (Exhibit B, Complaint).

(3) Plaintiff's employment as Assistant Professor without tenure was renewed in 1970 by the University of Pittsburgh for an additional term of three years until June 30, 1973. Her present salary after certain raises and a cost of living increase is $18,000 per year.

(4) Prior to June 30, 1973, it was necessary that the University of Pittsburgh decide whether plaintiff would be granted tenure and be promoted to Associate Professor or have her employment terminated.

(5) During her employment at the University of Pittsburgh, plaintiff did attain membership in the American Society of Biological Chemists; attained professional stature; did publish independent research of high quality; was active in other contributions; and, fulfilled her teaching requirements in a fashion that was not criticized prior to 1971.

(6) At no time was plaintiff advised that the criteria for promotion in her department had changed or that the criteria in the Faculty Handbook of the University of Pittsburgh had changed.

(7) The criteria for appointment and promotion of tenured employees is set forth in the Faculty Handbook of the University of Pittsburgh as follows: effectiveness as a teacher; research and scholarship; professional stature; and, other contributions.

(8) At no time during the years 1967, 1968, 1969, 1970 and 1971 was plaintiff advised that her teaching was inadequate or that her research was not in an area relevant to the Department of Biochemistry or the School of Medicine except that the head of the Department in September 1971 suggested that she should have her equations ready on the blackboards in lecture.

(9) In September 1971 the University of Pittsburgh, by Dean Donald Medearis of the School of Medicine, agreed to be the grantee institution for grant application by plaintiff which resulted in an award of $93,000 by the National Institute of General Medical Sciences of the National Institutes of Health for research to be conducted by plaintiff as principal investigator over a period of three years.

(10) On October 27, 1971, the Chairman of the Department of Biochemistry called a meeting of the tenured professors of that Department to discuss the appointment to tenure of plaintiff.

(11) The October, 1971, meeting was held without notice to plaintiff; without any request of plaintiff to supply references from whom the committee could obtain an assessment of her work; and, without affording plaintiff the opportunity to supply information on current research, or matters submitted to publications but not yet printed.

(12) There is no evidence that the procedure used in October 1971 was ever before used to terminate the employment of a professional employee in the tenure stream at the University of Pittsburgh.

(13) On October 27, 1971, it was decided not to grant plaintiff tenure and this was based primarily on the committee's finding that plaintiff's teaching was inadequate. This conclusion of plaintiff's teaching was purportedly based on an assessment of four lectures by plaintiff in September 1971.

(14) The first lecture given by plaintiff in September, 1971, was regarded by the Chairman as being good in its approach and content but was criticised as to placing of equations on blackboards.

(15) The 1971 assessment of plaintiff's teaching failed to consider her teaching of 4 years; did not consider either plaintiff's teaching of graduate students in the Biochemistry Department, or plaintiff's other teaching functions in advising students and in laboratory instruction, nor was consideration given to the other criteria set forth in Finding No. 7.

(16) Plaintiff was first notified that her employment would be terminated on January 6, 1972, in a conversation with the Chairman of the Department, after she had been made aware of the possibility at a Christmas party. She later received a letter to this effect March 8, 1972.

(17) Plaintiff after several unsuccessful attempts met with the Dean of the School of Medicine in the months of March and April 1972 and thereafter met with the Senate Academic Freedom and Tenure Committee of the University of Pittsburgh. No existing procedure for further hearing by the Chancellor exists, although discussions continued for further proceedings which never materialized.

(18) Plaintiff's research grant will be terminated on June 30, 1973, unless her employment is extended by the University of Pittsburgh. It is necessary that the government grant as to which notice of termination was previously given by the University be continued by notice to the National Institution of Health prior to June 1, 1973.

(19) Plaintiff has made attempts to obtain employment elsewhere by listing her availability with professional societies, answering ads for jobs, and applying for employment to numerous institutions of higher education, all without success.

(20) Both the opportunity for other employment, and the opportunity to obtain funds for research are severely restricted at the present time because of cut backs in federal and other funds.

(21) Even if plaintiff is now offered employment at an institution starting September there is not sufficient time to transfer the research grant and it would be terminated.

(22) Plaintiff will suffer irreparable harm if her employment is not continued at the University of Pittsburgh through loss of salary, loss of the grant for research and damage to her professional standing.

(23) The evidence indicates that sex discrimination was operating at the University of Pittsburgh throughout the time of plaintiff's employment and the University has in effect an affirmative action plan which is purported to reduce such discrimination.

(24) In the decision of October 27, 1971, defendants presented no evidence that the criteria for promotion pertaining to plaintiff's research and scholarship, professional stature, and other contributions were properly considered.

(25) After October 27, 1971, the Chairman of the Biochemistry Depart-

ment of the School of Medicine, Edward C. Heath, and the tenured faculty then solicited outside documentation to discredit plaintiff in an effort to substantiate their decision.

(26) In the granting of tenure after seven years to a male professor, Warren Divan, the School of Medicine through Dean N. Medearis applied different standards than those which were applied to plaintiff although Professor Divan taught some of the same courses as plaintiff and had substantially the same evaluation as a lecturer.

(27) The School of Medicine consistently paid less compensation and awarded smaller raises to plaintiff than were awarded to male members of the faculty.

(28) The School of Medicine has consistently granted tenure to men employees and not granted tenure to women employees.

(29) In 1971 plaintiff received an annual merit and cost of living increase in compensation in the amount of $900 per year, while in July 1972 after the decision to terminate her employment for ineffectiveness, plaintiff received a merit and cost of living increase in the amount of $1,100.

(30) The termination employment will result in damage to plaintiff in interruption of scientific research, in termination of research funds and in damage to reputation all of which factors may render it impossible for plaintiff to recover professionally.

(31) In the event that the School of Medicine is required to continue the employment of plaintiff pending a final hearing this would be "disadvantageous" to defendants according to the testimony of Dean Donald N. Medearis but the disadvantage would be small compared to the irreparable harm to plaintiff as above set forth.

(32) The decision to terminate the employment of plaintiff and refuse her tenure is not final and is subject to modification prior to June 30, 1973.

(33) Plaintiff filed a complaint before the Equal Employment Opportunity Commission on April 9, 1972, and received a 90 day letter authorizing her to bring this suit on November 17, 1972.

(34) Plaintiff filed this suit on February 9, 1973, and has applied for a preliminary injunction to prevent termination of her employment on June 30, 1973. This application was heard before the court on April 2, May 16, 17 and 18, 1973.

## DISCUSSION

After this case had been filed and after we had commenced taking the testimony of plaintiff in connection with her application for preliminary injunction the Court of Appeals for the Third Circuit entered its decision in Braden v. University of Pittsburgh, 477 F.2d 1 (slip opinion filed April 11, 1973,) in which another sex discrimination case brought by a female assistant professor in the dental school which had been dismissed by another judge of this court was reversed and sent back for a full development of all the facts. The court directed that the facts be developed to determine whether the University of Pittsburgh was a State Institution or not and whether it was subject to the Civil Rights Act, 42 U.S.C. § 1983.

Upon receipt of the opinion of the court in Braden, this court denied all motions to dismiss in the instant case, involving a female assistant professor in the School of Medicine, and ruled that the facts would have to be fully developed to determine whether or not the University of Pittsburgh was a State Institution and whether its officials would be subject to 42 U.S.C. § 1983. The matter is presently before the court on a motion for preliminary injunction.

Braden, however, is not dispositive of this case. This suit was also brought under the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Subchapter 6, Title 7 Equal Employment Opportunities) and the 1972 amendments thereto added by Public Law 92–261 approved March 24, 1972. The Civil Rights Act of 1964 as originally enacted 42 U.S.C. § 2000e–1

did not apply to educational institutions. The 1972 Act struck out the exemption of educational institutions and hence plaintiff in this case relies not only upon 42 U.S.C. § 1983 and other sections of the Ku Klux Klan Act but also upon the Civil Rights Act of 1964 as amended. This act provides in Section 703 (42 U. S.C. § 2000e–2(a)) that it is unlawful to discriminate an individual because of sex.[1]

The enforcement provisions Section 706 (42 U.S.C. § 2000e–5(g)) provide that the court may enjoin respondent if it finds that it has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint.[2]

■ Defendant contends that this case is not subject to the 1972 amendments from the Civil Rights Act of 1964 for the reason that the action to discharge defendant was decided upon at a meeting of the tenured professors from the Department of Biochemistry held October 27, 1971, and she was notified verbally on January 6, 1972, that her employment would be terminated on June 30, 1973. Her discharge was confirmed to her in a letter dated March 8, 1972. The University therefore claims that her discharge was complete and that the decision to refuse to give her tenure was final prior to March 24, 1972, the effective date of the amendment, even though the discharge and refusal of tenure was not to be effective until June 30, 1973.

She filed charges alleging sex discrimination before the Equal Employment Opportunities Commission on April 9, 1972, as well as other charges before the state commission and received a 90 day letter authorizing her to bring this suit on November 17, 1972.

The court takes the view that the position of the University is not well taken, that if sex discrimination is operating in this department of the University and we find a prima facie case of sex discrimination, then the results of this are being made effective following the effective date of the 1972 amendments. She is still employed at the University

1. *Unlawful employment practices—Employer practices*
(a) It shall be an unlawful employment practice for an employer
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

2. *Public Health and Welfare*
*Injunctions; appropriate affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders*
(g) if the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000e–3(a) of this title.

and will be out of employment June 30, 1973.

The Act is silent as to its effect on a situation such as this. In Section 14 of the 1972 amendments, there is a provision that Section 706 (42 U.S.C. § 2000e–5), the procedure section, applies to cases where the charges were pending on the effective date of the Act and to all charges filed thereafter. The Act, however, is silent with respect to Section 702 the removal of the educational exemption.

We hold that the 1972 amendments cannot be rendered nugatory by making a decision before March 24, 1972, to become effective thereafter as a discriminatory discharge and refusal to grant tenure thereafter is as much a violation of the Act as any other sexual discrimination. It will be noted that it is an unlawful employment practice "to discriminate as to any individual because of sex". The discharge and refusal of tenure on June 30, 1973, will, under the circumstances of this case, amount to such discrimination. We cannot believe that Congress intended that such action could be effectual in violation of the plain mandates of the Act. The Supreme Court has held that the purpose of the Civil Rights Act is to achieve equality in employment opportunities and remove barriers which operated in the past. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In Walker v. Kleindienst, 357 F.Supp. 749 (D.C.1973) it was held that the 1972 amendments are remedial in nature and cover charges of discrimination pending before the Civil Service Commission or which were at some other stage of the remedial process on March 24, 1972 when the amendments took effect. The 1972 amendments also extended Title 7 to cover discrimination in Federal employment and present substantially the same situation as to it as the extension to an educational institution. In that case, the Department of Justice attempted to discharge plaintiff on March 24, 1972, and the court held that it had jurisdiction under the amendments since

proceedings were pending at that time. We are aware of the decision in the Northern District of Illinois, Hill-Vincent v. Richardson, 359 F.Supp. 308 (1973) which seems to hold to the contrary but in that case it is noted that the discriminatory discharge had taken place apparently before the effective date of the 1972 amendments. In any event, we follow Walker v. Kleindienst, supra, as being the most persuasive opinion in this matter of apparent first impression.

Since we hold we have jurisdiction under the 1972 amendments to Title 7 of the Equal Employment Opportunities Act, it is unnecessary at this time to go into the Braden questions to determine whether we also have jurisdiction under the Ku Klux Klan Civil Rights Act. The discharge here will not take effect or become final until June 30, 1973. Section 703 as now amended (§ 2000e–2) makes it unlawful to *discharge* or otherwise discriminate because of sex.

■ We now pass to the question of whether a preliminary injunction should issue under the facts of this case, applying the usual tests for such action which were recently summed up by our Court of Appeals in A.L.K. Corp. v. Columbia Pictures Industries, Inc., 440 F.2d 761 (3d Cir. 1971). There it was held that the moving party "must generally show (1) a reasonable probability of eventual success in the litigation and (2) that it (she) will be irreparably injured pendente lite if relief is not granted to prevent a change in the status quo." To put it another way, has plaintiff made a prima facie showing of a reasonable likelihood of success on the merits and do the balance of the equities indicate that a preliminary injunction should issue?

It is obvious that in a case of sex discrimination, as in a case of race discrimination, we very seldom find a resolution of a board of directors or a faculty committee agreeing to engage in sex discrimination any more than we would expect to find the same in a conspiracy to violate the antitrust laws. The existence of such discrimination must there-

fore be found from circumstantial evidence and inferences from the circumstances.

■ We agree that the statistics and other evidence of discrimination showing the imbalance of men and women with tenure in the School of Medicine and the Department of Biochemistry in particular make out a prima facie case which imposes upon the defendant the duty to go forward with rebutting evidence. Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970); Jurinko v. Weigand Co. (3d Cir. 1973, infra). The bases for this conclusion are shown in the findings of fact. We do not necessarily have to agree with Dr. Gerald Gardner that the probability of no discrimination shown in these figures is one chance in 400 million but we would agree that the chances are very small. The defendants offered no contradictory statistical testimony and did not in any way cast doubt on Dr. Gardner's figures. The defendant instead attempted to show that sex discrimination did not enter into the decision of tenured faculty to deny plaintiff tenure and promotion to an associate professorship, and also introduced evidence, most of it gathered after the making of the decision to discharge her, to indicate that she was a poor teacher. The evidence offered in this case shows that out of 401 faculty members in the School of Medicine, only 5 women have tenure. Six Departments in the School have no women at all, eleven have no tenured women and only three have women with tenure. The average salary for male tenured professors is $37,500 while the average salary for women with tenure is $27,000. Increases in salary are granted at a higher rate to male professors than female. There are four times as many women eligible for tenure on this faculty as there are men. During the last six years, 70 men were given tenure as compared to 3 women. The figure sent by the Medical School to the Affirmative Action office of the University show that the Medical School plans little by way of affirmative action at any

definite time so as to change these figures and alter the imbalance in any way. This Affirmative Action office was established after a prior investigation by the Department of Health, Education and Welfare of sex discrimination at the University.

When the instant matter was taken before the University Senate Subcommittee on Academic Freedom and Tenure it was indicated that there was some substance to Dr. Johnson's charges that there was some discrimination in this department and it should be investigated. The evidence with respect to discrimination is clinched by the fact that the number of women in the faculty has been decreasing in the past two years as compared to men whereas one would expect in the face of charges such as these some attempt would be made to increase the number of women.

The defendant introduced a large amount of evidence indicating that plaintiff was not a satisfactory teacher. It is not the function of this court to determine what weight should be given in a university of the high stature of the University of Pittsburgh to basic and advanced research versus teaching abilities. Nevertheless the handbook and guidelines adopted by this University do indicate various criteria which are to be used in determining tenure, only one of which was given any weight in this particular case. As might be expected various individual students rated the plaintiff low in teaching ability while others rated her high. (See testimony of Dr. Davis as to this.) When all the evaluations were gathered in, however, it appeared that there was only a miniscule difference between plaintiff's standing and that of a man who was given tenure. After the decision of the tenured faculty, opinions derogatory to plaintiff's teaching ability were sought and received to justify the decision. The previous head of the Department, however, contacted in Europe stated that he thought she should be given tenure.

■ In a case such as this the question is whether there is a disparate

treatment of males and females based upon sex: Cypress v. Newport News Hospital, 375 F.2d 648 (4th Cir. 1967). A review of the testimony in this case indicates that there has been such disparate treatment in this medical school.

We do not reach the question of due process in connection with plaintiff's discharge because there is no evidence that she was denied tenure as a result of the exercise of her constitutional rights such as free speech or other things protected as "liberty" or "property". See Perry v. Sinderman, 408 U.S. 593, 33 L. Ed.2d 570, 92 S.Ct. 2694 (1972); Walker v. California State College Board of Trustees, 351 F.Supp. 997 (W.D.Pa. 1972). We are, of course, aware of the recent case of Green v. Board of Regents of Texas Tech., 335 F.Supp. 249 (N.D. Tex.1971) aff'd 474 F.2d 594 (5th Cir. 1973). In that case after a trial on the merits the court found that the female teacher had been refused a promotion to full professor not because of her sex and not because of any pattern of sex discrimination. The District Court found as a matter of fact that there was no discrimination operating in the school, that all the established criteria for a promotion had been considered, and that they were reasonably applied in the case. Such is not the situation in the case at bar.

In arriving at our conclusion, we have also carefully considered the decision of the Court of Appeals for this Circuit in Jurinko v. Wiegand Co. in general affirming Judge Teitelbaum of this court in 331 F.Supp. 1184 (W.D.Pa.1971). See opinion 3d Cir. 1973, 477 F.2d 1038 where the court said:

"Nor was the evidence insufficient to support the finding of a violation of Title VII as to these particular plaintiffs. The evidence, especially the fact that during the six month period following the plaintiffs' application (and when the plaintiffs were told that the company was not then hiring) 43 new male employees were hired despite the fact of plaintiffs' prior experience and good work records with the company, does support an inference of discrimination as the district court found. Plaintiffs made out a prima facie case of unlawful discrimination, thereby shifting the onus of going forward with evidence to Wiegand. As was said in Hodgson v. First Federal Savings and Loan Association of Broward County, Florida (4 EPD 7629) 455 F.2d 818 (5th Cir. 1972), 'In discrimination cases the law with respect to burden of proof is well settled. The plaintiff is required to make out a prima facie case of unlawful discrimination which point the burden shifts to the defendant to justify the existence of any disparities. See, e. g., Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Muniz v. Beto, 434 F.2d 697 (CA 5, 1970); Weeks v. Southern Bell Telephone and Telegraph Co. (1 EPD 9970) 408 F.2d 228 (CA 5, 1969); Gates v. Georgia Pacific Corp. (2 EPD 10,305) 326 F. Supp. 397 (D.C.D.Or.1970). Once the plaintiff has made out his prima facie case we look to the defendant for an explanation since he is in a position to know whether he failed to hire a person for reasons which would exonerate him.' "

For these reasons, we find there is a strong likelihood of plaintiff's success on the merits. According the other considerations governing the issuance of a preliminary injunction proper weight, we note that this is not the ordinary case of a salaried employee who is wrongfully discharged where a remedy in damages is adequate. Rather here we have a Ph. D. with an outstanding professional reputation which will be unquestionably damaged by this. Her ability to get a job will certainly be impaired because of inability to secure recommendations from her present employers. It appears that jobs are very difficult to obtain at this time for people in this field and the mere fact of her discharge or failure to receive tenure from the University of Pittsburgh would naturally chill her chances of obtaining another position.

Beyond this, we have the factor of the irreparable damage to plaintiff's reputation as a research scientist as the result of this discharge and also the effect upon the grant which the National Institution of Health has given to the University for research to be done by her. It was testified that while much of the equipment which had been purchased for this grant would not be destroyed, nevertheless much of it would be rendered worthless, and the research already done on the project would be wasted. While the University has offered to transfer the grant to any other institute where plaintiff might get a job, nevertheless it is obvious that she is not going to get a job with any other institution and this is a futile gesture. We thus have very little difficulty in finding irreparable hardship to plaintiff.

On balancing the equities to weigh against the hardship to plaintiff, we find very little hardship to defendant. Although Dr. Madearis testified there would be disadvantage to the University, nevertheless the fact is that the University would be receiving her services for her salary and also the results of her fulfilling the research grant. It was testified that the research grant will fall unless steps are taken 30 days prior to June 30, 1973, to assure its continuance. This has necessitated the haste with which the court has had to act in making a determination of the issuance of the preliminary injunction. It would appear that the defendant has acquired no vested rights under the decision to discharge made on October 27, 1971. This is not irreversible until June 30, 1973. We are unable to determine that the University would sustain any actual damage if a preliminary injunction were granted and they were required to keep plaintiff on the payroll pending her work on her research grant as an assistant professor without tenure pending determination of this case. We have the further factor that the Act of Congress specifically authorizes an injunction in such a case.

One other matter should be considered. Under Section 706(g) of Title 7 (42 U.S.C. § 2000e–5(g)) the court must find that respondent has intentionally engaged in discriminatory practices. Of course it is obvious that we would not find a likelihood of success on the merits if we were able to determine that plaintiff was refused advancement and tenure for reasons other than sex discrimination.

The word "intentional" in the Act has been interpreted as meaning the defendant intended to do what it did. Local 189 United Papermakers v. United States, 416 F.2d 980 (5th Cir. 1969). The finding of intentional discrimination, however, cannot be made if there was a mistaken reliance upon state law which was invalidated. Kober v. Westinghouse Electric Corp., 325 F.Supp. 467 (W.D.Pa.1971).

In the instant case, we find intentional wrongdoing from the failure to implement or set any date for an affirmative action plan to eliminate such discrimination and the fact that while affirmative action was supposed to have been taken, the number of women faculty members in this school substantially decreased instead of increased, and from the fact that the decision to refuse tenure was made without consideration of any criteria other than evaluation of the teacher's teaching ability from reviewing four lectures. No substantial attention was paid to the plaintiff's work with graduate students or her standing as a research scientist. We also have the subsequent attempt to secure material which would bolster the decision of the tenured faculty when they saw that trouble was brewing. We have already issued an order for a preliminary injunction in this case and file this discussion, findings and conclusions in explanation thereof.

CONCLUSIONS OF LAW

(1) This court has jurisdiction over the parties and this cause pursuant to 42 U.S.C. § 2000e–1 et seq., in that the acts

of discrimination continued after March 21, 1972, the effective date of the extension of coverage of the statute to educational institutions. Belt v. Johnson Motor Lines, Inc., 458 F.2d 443 (5 Cir. 1972); Bartness v. Drewrys U.S.A., Inc., 444 F.2d 1186 (7 Cir. 1971). Walker v. Kleindienst, supra.

(2) Plaintiff has made out a prima facie case of intentional discrimination on the basis of her sex which will result in termination of employment as of June 30, 1973, by proof as follows:

(a) statistical evidence of a pattern and practice of discrimination against women in the School of Medicine, University of Pittsburgh, Parham v. Southwestern Bell Telephone, supra; United States v. Local 638 Enterprises Assn. Etc., 347 F.Supp. 169 (S.D.N.Y.1972);

(b) evidence that a comparable male professor was granted tenure in 1971 in the School of Medicine, through disparate treatment based on sex. Cypress v. Newport News General & Nonsectarian Hospital Assn., 375 F.2d 648 (4 Cir. 1967);

(c) proof that all of the male professors in plaintiff's department, regardless of rank or tenure, were uniformly given increases in compensation of $1,500 per year while plaintiff, the only women in the Biochemistry Department during the years 1967–1972, was given raises averaging $1,000 per year.

(d) the procedures here adopted in the Department of Biochemistry were never used prior to this termination.

(e) evidence that the defendants in their affirmative action program have taken no substantial steps to eliminate discrimination against women in the School of Medicine and the Department of Biochemistry.

(f) decreasing the number of women on the faculty of the School of Medicine in the years 1970–1972 while complaints of sex discrimination were pending.

(3) Plaintiff has established a prima facie case of arbitrary denial of equal protection by the actions of the tenure committee, the Chairman of the Department of Biochemistry and the Dean of the School of Medicine.

(4) Plaintiff has established a prima facie case of arbitrary action and denial of equal protection by the actions of administrative officers of the University of Pittsburgh, including Chancellor Poswar, Dr. Francis S. Cheever, Vice Chancellor of Health Professions and Dean Donald N. Medearis in the failure to afford plaintiff a method by which her grievance might be fully and fairly heard at an early date.

(5) Plaintiff has established that she will sustain irreparable harm as a result of her termination of employment with the School of Medicine, University of Pittsburgh for the reason that research grants will be terminated as of June 30, 1973, and her professional career will be irreparably damaged.

(6) Defendants have failed to show that retention of plaintiff for an additional period, until this matter can be finally adjudicated on the merits, will be any more onerous than "disadvantageous".

(7) It is in the public interest to grant a preliminary injunction to plaintiff. United States v. Hayes International Corp., 415 F.2d 1038 (5 Cir. 1969).

(8) The evidence establishes a reasonable probability of plaintiff's success on the merits.

(9) A preliminary injunction should be issued to preserve the status quo pending final determination of this case on the merits. The injunction has already been issued and this is in explanation thereof.