Joan K. PETERS

v.

**MIDDLEBURY COLLEGE and James Armstrong.**

Civ. A. No. 73–153.

United States District Court, D. Vermont.

Jan. 22, 1976.

David Curtis, Hoff, Curtis, Bryan, Quinn & Jenkins, Burlington, Vt., for plaintiff.

Karen McAndrew, Frederic W. Allen, Dinse, Allen & Erdmann, Burlington, Vt., for defendants.

HOLDEN, Chief Judge.

The plaintiff, Joan Peters, a former member of the faculty of Middlebury College, seeks in this action against the College and its former president, to vindicate rights which she asserts are protected by Title VII of the Civil Rights Act of 1964. Her claim is generated by the defendants' refusal to extend her non-tenured position on the faculty in the English department of the College. She contends the defendants' failure to offer her a third year teaching contract was based on her sex and, more particularly, her introduction into the academic courses assigned for her instruction, activist views concerning feminism. The court's jurisdiction is invoked under 42 U.S.C. § 2000e–5. (See Memorandum and Order of this court filed September 11, 1974.) The case was heard by the court during four days of trial. From the evidence presented, the court finds the facts which follow.

### Findings of Fact

After being interviewed in New York City and on the college campus by various members of the Middlebury English department, the plaintiff was appointed to the faculty at Middlebury College for the academic year which commenced in September, 1971, and ended June 30, 1972. Her appointment was to the rank of instructor with promotion to assistant professor to follow on her receipt of her doctorate.

New appointments to the Middlebury faculty are made by the president of the college, subject to confirmation by the board of trustees. Reappointments and promotions are accomplished by the board upon recommendation of the president. Before making the decision to recommend reappointment or not, the president is required to secure written recommendations of the chairman of the department concerned, and to consult with the faculty subcommittee on tenure and promotion, referred to as the "Senior Faculty Council." These requirements are set forth in the Middlebury College Handbook (Def.'s Ex. U). Appointment and reappointment are based on a judgment of professional competence, the promise of the person concerned as to future, and by his or her contributions to the college community. Professional competence is to be measured primarily in terms of teaching ability. Judgment in these areas is to be consistent with academic freedom as defined in the 1940 Statement of Principle of the American Association of University Professors. (Handbook Def. Ex. U).

At the time of her employment the plaintiff was advised by the acting chairman of the English department that in all likelihood she would be offered a second year contract, as such an appointment tends to be fairly automatic. She was also told that if things went well the College hoped she would stay for a third year; this would depend on performance. At the same time the plaintiff was informed that there would be little likelihood of her being asked to stay beyond three years. The College Handbook, with which Ms. Peters was conversant, provided that at the rank of Instructor, "appointments should be for one or two years."

In February, 1972, Ms. Peters was offered a second contract for the ensuing

year.[1]  Since she had not received her doctorate, the renewal was at the rank of instructor; she accepted the contract. Before the plaintiff accepted reappointment on February 15, 1972, Professor Littlefield wrote a memorandum to Ms. Peters, enclosing a copy of her initial contract and referred specifically to the Handbook provisions relating to appointments to the faculty at the rank of Instructor.

In a December conference, before the second contract was tendered, Ms. Peters was informed by the chairman of the department, Professor David Littlefield,

1.

EXHIBIT·X

FEB 21 1972

# MIDDLEBURY   COLLEGE
### MIDDLEBURY, VERMONT
05755

February 12, 1972

Mrs. Joan K. Peters
R. F. D. 1
Brandon, Vermont  05733

Dear Mrs. Peters:

I have the honor to inform you that you are reappointed

Rank:     Instructor in English, with promotion to Assistant
          Professor upon completion of Ph.D.

Term:     For the academic year ending June 30, 1973

Salary:   $10,000 per annum, payable in twelve monthly
          installments beginning September 30, 1972

This notification is sent to you in duplicate with the request that you indicate your acceptance by your signature with date, and return the duplicate copy to this office within fifteen days after its receipt.

Cordially yours,

_James V. Armstrong_
President

cc: Treasurer
    Dean of the Faculty

Feb 15, 1972
Date

I hereby accept this reappointment and the terms under which it is made.

_Joan Peters_
Signature

that this was customary. He went on to point out that she was "too political," that the College was not politically motivated. The chairman suggested that if she wished to actively pursue her interest in the women's movement, she should look for employment in an urban environment. During this meeting Professor Littlefield informed the plaintiff that her career interest professionally must be in line with the program needs of the English department; that her zealous interest in literature imaging women, or literature written by women, must take a place of secondary importance, since there was no great demand for such courses at Middlebury, as reflected in the enrollment figures for the forthcoming winter term. He pointed out that in a future renewal, her competence in the Renaissance courses would be most important. There also was some discussion concerning the prospect of a three year term, held out at the time of Ms. Peters' initial appointment. Professor Littlefield informed the plaintiff that the reference to three one-year contracts assured nothing; that annual reviews were of first importance.

On January 10, 1972, the chairman of the department recommended the plaintiff's reappointment for a second year. In his letter to the president of the college he expressed some reservations about the plaintiff's teaching, indicating that "perhaps because she is a little too assertive in manner or because she does not seem fully to encounter, or communicate the intellectual complexity of her subject matter, Joan has not yet established herself as the strong teacher she will need to become if she is to be continued in the department."

A review for the purpose of considering plaintiff's reappointment for a third year was undertaken early in her second year of teaching at Middlebury. There was no observation nor faculty auditing of her class work during the fall of her second year before the chairman's recommendation to the president was made. In preparing his recommendation, the chairman followed the customary and prescribed procedure in soliciting written comments from the tenured members of the English department, informal comments from some of the junior members, and a recommendation from the Student Advisory Council to the English department.

On October 30, 1972, the department chairman sent to the president of the college, the defendant, James I. Armstrong, a recommendation of non-reappointment for the plaintiff. His letter goes on to state:

The principal reason for this recommendation is that she does not meet the high standards of professional competence, especially in the upper division course to which this department aspires and toward which it labors. She is not discriminatingly rigorous in the examination, analysis and presentation of literature, literary history, or intellectual history. She is energetic, enthusiastic and uncritically open to any view. She seems not to know, or perhaps is unable to articulate, the principle of criticism, the intellectual assumptions by which she operates. She has read widely and possesses a good deal of information, but her discourse about literary matters is neither systematic or sophisticated.

On this central matter of Joan's intellectual abilities and classroom performance, the senior members of the English staff, John Clagett excepted, are in agreement. We have heard her lecture, worked in staff courses with her, sat on oral examination boards with her. We are in general agreement she ought not to remain long among us, that she is not serving the department well in teaching the upper division Renaissance courses for which she was recruited.

\* \* \* \* \* \*

The course of action I recommend is not likely to be popular with students who, though they in part recognize her intellectual limitation, are warmly responsive to her enthusiasm, energy, openness and ready human concern.

It is my hope these personal practices and virtues of attitude, which are very real indeed, and make Joan a most personable colleague, will sustain her spirit and insure her continuing cooperation at a time of disappointed hopes. Def. Ex. H, (Ltr. David J. Littlefield, Oct. 30, 1972).

This communication accurately conveyed the consensus of the senior members of the English department. Two of this group were in favor of Ms. Peters' retention to teach first and second year courses. There was substantial agreement that her competency in advanced courses, particularly in the Renaissance, was doubtful.

President Armstrong submitted the recommendation of the plaintiff's non-reappointment to the Senior Faculty Council for review. The Council, whose membership is elected by the faculty, then interviewed the tenured members of the English department, with the exception of the chairman, as well as some other members of the faculty who were thought to have an opinion of the plaintiff's competence in her field. The Senior Faculty Council, after its investigation and review, accepted the department's judgment that the plaintiff was not desirable because of professional deficiencies. It determined that the recommendation not to reappoint was an academic judgment. Although the Council was aware that some difference of opinion existed within the department as to reappointment for one more year, it was felt that "humanitarian considerations" explained the divergence. With this in mind, all three members of the Council recommended nonreappointment to the president. The president recommended to the board of trustees that the plaintiff not be reappointed.

On December 20, 1972, the plaintiff informed President Armstrong in writing that she wished to appeal the decision of non-reappointment on the ground that the decision not to renew was the result of sex discrimination. In keeping with the established procedure for such an appeal, the Committee on Conference with the Trustees was convened on February 20, 1973. The plaintiff submitted an extensive brief and accompanying materials in support of her appeal.[2] The jurisdiction of the Appeals Committee is limited to questions of violations of academic freedom and questions of procedure. The plaintiff asserted no challenge to the procedure but staked her appeal on sex discrimination as a constituent of violation of academic freedom.

The Appeals Committee interviewed the members of the Senior Faculty Council, senior and junior members of the English department, the Student Advisory Council to the English department, who offered support of Ms. Peters, and several professors outside the English department.

In its final report the Appeals Committee indicated that it found no "violation of academic freedom as defined in the Faculty Handbook." However, the Committee was unanimous in finding injustice and prejudgment in the manner in which the decision not to reappoint was reached. The Committee was "not of one mind whether this prejudgment involves a violation of academic freedom." The Committee noted three specific instances of injustice in the manner in which the decision not to rehire was reached and reviewed: (1) the chairman of the department seemed predisposed to interpret faculty and student recommendations as negative, and seemed unwill-

---

2. The Appeals Committee had before it a memorandum from the plaintiff explaining her reasons for believing her failure of reappointment was based on sex discrimination. The Committee also had a letter from Dr. Madeline Gohlke expressing her views on her experience at Middlebury, a letter in her support from the Student Advisory Council and other students and a list of faculty members Ms. Peters requested to be interviewed by the Committee. Also included were excerpts from writings on the issue of sex discrimination in the academic world. Pltf. Ex. 3.

ing to accept clarification of these comments; (2) insufficient weight was given to the opinion of most of those interviewed that the plaintiff showed marked improvement in her work throughout her first year and into her second, and failure to consider her performance during the fall term of 1972 was inexcusable; (3) the review by the Senior Faculty Council of the chairman's recommendation also misconstrued some of the comments by professors, and was faulty in several other respects. None of these examples could be ascribed specifically to sex discrimination. The committee recommended to the president that he take whatever means he deemed appropriate to rectify the injustice that was found.[3]

3.

MIDDLEBURY COLLEGE
MIDDLEBURY, VERMONT
05753

DEFENDANT'S EXHIBIT M

DEPARTMENT OF RELIGION

March 17, 1973

President James I. Armstrong
Old Chapel

Dear President Armstrong:

The Committee on Conference with the Trustees met as an appeals committee to consider the appeal of Ms. Joan K. Peters of her non-reappointment to the faculty. We have noted her allegation that the recommendation of non-reappointment involved a violation of her academic freedom; specifically, that the recommendation not to reappoint her was punitive, a disciplinary action provoked by her feminist beliefs and activities. She further alleges that this action was preceded by a pattern of harassment and discrimination directed against her as a woman and as a feminist. Her charges are directed specifically against the chairman and the senior members of the department of English.

During the past four weeks we have reviewed her charges and the reasons supporting them; we have interviewed members of the Subcommittee on Promotion and Tenure (the Senior Faculty Council); the senior members of the department of English, and others, students and faculty whose testimony would enable us to evaluate her case. The minutes accompanying this letter give an accurate account of our interviews.

We find no evidence supporting the charge of violation of academic freedom as defined in the Faculty Handbook, nor does there appear to us to have been any violation of procedure as outlined in the Handbook. However, we do not believe that the alternatives (violation of academic freedom or procedural violations) are adequate to cover the complexities of the case. It is our unanimous opinion that there has been an injustice, that the case has been prejudged. We are not of one mind whether this prejudgment involves a violation of academic freedom.

1. The chairman of the department of English seems to have prejudged the case. His treatment of two items support this:
   a) He interpreted Mr. Martin's recommendation as negative (see item 3).
   b) He interpreted the ambiguities in the Student Advisory Council's first letter as a negative recommendation and seemed

The minutes of the interviews held by the Appeals Committee with the members of the English department demonstrate that there was not complete unanimity concerning the effect that the plaintiff's feminist activities and beliefs had on the decision not to reappoint for a third year. There is evidence, however, of substantial agreement on the question of the plaintiff's remaining in the department for more than three years. The consensus was that she did not have the requisite expertise in the field of Renaissance literature to justify

unwilling to accept their clarification and explanation that they intended it to be affirmative. The students felt that the ambiguities in the first letter were caused by the chairman's remarks to them when requesting their recommendation. They felt intimidated. We were impressed by the seriousness with which they approached their task and the genuineness of their feelings.

2. We believe that insufficient weight was given to the opinion of most of those interviewed that Ms. Peters showed marked improvement in her work throughout her first year and into the second. Failure to consider her performance during the Fall term, 1972, is not obviated by her request for an early decision.

3. We wonder whether the Senior Faculty Council was not overcautious and inflexible in considering a recommendation that they had reason to believe might be challenged. Caution is not always wise, and in this case it may have led to a lack of sensitivity. Knowing that the recommendation of the chairman of the department of English might be challenged, the Council nevertheless made no effort to interview him. One council member who interviewed Mr. Martin seems to have misconstrued his positive recommendation as negative. This is important because Mr. Martin had worked more closely with Ms. Peters than had other senior members of the department. Neither did the Council see fit to interview any of the students who submitted recommendations, and who were on the whole affirmative. The Council seems to have been unaware that there was any significant disagreement within the department of English with the department chairman's evaluation. In another instance, a Council member failed to follow up a statement made during an interview by a senior member of the department of English which impressed us as prejudicial.

We do not believe that the Faculty, in adopting the Rules of Promotion and Tenure intended to prevent this committee from considering injustices other than those encompassed by violation of academic freedom or procedural violations. Therefore, we recommend that you take whatever means you deem appropriate to rectify the injustice that we have found.

Respectfully submitted,

Victor L. Nuovo

Marjorie Lamberti

Bruce B. Peterson

more than an initial three year appointment.[4]

The Appeals Committee reported the results of their findings and review to the president of the College on March 23, 1973. This was reported to the plaintiff by letter of Dr. Armstrong, who stated that her appeal was dismissed in accordance with the Faculty Rules of Appointment and Tenure. President Armstrong formed no first hand information on the teaching, scholarship or community service of the plaintiff while she was at Middlebury. In the final action taken, he principally relied upon the recommendations of those who were required to judge the credentials of candidates for reappointment according to the procedures set up in the Faculty Handbook. He asserted at trial that a finding of sex discrimination by the Appeals Committee would indicate a violation of the plaintiff's academic freedom.

Following her departure from the Middlebury campus, the plaintiff subsequently obtained her doctorate at the University of Chicago. And during this time, while completing her dissertation, Dr. Peters taught, on a parttime schedule, at Goddard College in Plainfield, Vermont, for a period of one and a half years, commuting by air after she and her husband moved to Chicago. Her teaching at Goddard produced an aggregate salary of $6,000.

4. On these two questions the professors lined up as follows:

Professor Littlefield: Questioned the plaintiff's ability to teach and the depth of her expertise in her field; in favor of immediate non-reappointment; claimed her involvement in feminist activities in no way influenced his judgment of her professional competence; but see # 7 above.

Pack: Opposed hiring plaintiff in the first place due to the difficulty in getting her to discuss literature at her initial interview; his first negative impression never changed—he stated that plaintiff "was more interested in discussing women's politics than literature . . . and that her heart-felt enthusiasms were concerns which are extra-academic." (Def. Ex. F). Although Pack asserted that plaintiff's feminism had no influence on his evaluation of her scholarly promise, in addition to the statements quoted above, he pointed out that he had been "surprised that [a certain student] wanted to work with him on her senior project" as the student was a "political supporter of Miss Peters." It was brought out at trial, however, that this particular student had worked very closely with Pack for three years before the project in question.

Professor Prickett: Questioned plaintiff's ability to teach advanced courses before she was hired; felt the stress on certain subject matter in some of her courses was misplaced; recommended one final appointment for a year, but did not feel she should remain on a long-term basis; stated that plaintiff's political activity distracted from her involvement in intellectual life and teaching, and expressed disappointment that she had chosen to teach courses during the winter term which were "so far removed from her specialty." (Def. Ex. D).

Professor Martin: Indicated that plaintiff had developed significantly as a teacher during her first semester, and that she was effective in lower level staff courses; recommended keeping her for another year at the freshman-sophomore level; felt she was not as strong in the Renaissance area as the department might wish; indicated that "tenured members of the department may have had attitudes about [plaintiff's politics]."

Professor Hill: Held opinion that plaintiff did not know much literature; recommended non-reappointment; admitted that plaintiff's political activity on campus affected his judgment as to her ability as a teacher; he "believed she was spending too much energy on her feminist interests and not enough in the preparation and conduct of her classes." (Tr. 253).

Mr. Price: Judged plaintiff to be as expert as a young member of the department could be; did not think her teaching had suffered from her involvement in feminist activity, but "heard comments that it did." He had no direct evidence that the decision not to rehire was based on other than academic considerations. He thought that if Ms. Peters had completed her dissertation for her doctorate, she would have been reappointed without distress.

Mr. Halpern: Considered plaintiff to be a competent teacher. Although her first upper division class did not go well, regarded her as "sensitive and intelligent"; never witnessed any occasion when plaintiff had been discriminated against because she was a woman, but had heard remarks against her extracurricular activities and believed that some members of the department were "not comfortable with a woman colleague and do not regard women as being as intelligent as men." (Def. Ex. E).

The administration of Middlebury College provided some money and assistance to feminist activities on campus during Ms. Peters' time at Middlebury. In the fall of 1971 the women's group had access to money with which they ordered films directed by women. At the end of the 1971–72 school year the college gave the women's group a large sum of money to finance a women's festival the following fall. The plaintiff had a predominant part in the festival which lasted two weeks. The project was well attended and favorably received by the college community.

Until Dr. Madeline Gohlke was appointed to the faculty in 1968, there were no full time women faculty members in the English department at Middlebury College. There have been no full professors who were women at Middlebury at any time. There are four women at Middlebury who are tenured members of the faculty; none in the English department.

Of the women given regular teaching appointments to the English department at Middlebury, none has been terminated after two years except the plaintiff. None of these faculty members stayed longer than three years. Since 1968 one man has been terminated at the end of two years; two men were terminated after seven years at Middlebury and one male after three years.

Dr. Gohlke preceded the plaintiff in the English department at Middlebury. She was impressed that she was treated differently from her male colleagues in the English department; however, Dr. Gohlke remained at the college for three years. Shortly before the plaintiff went to Middlebury, she met Dr. Gohlke informally on the campus of the University of Chicago. She complained to the plaintiff of an unfriendly attitude toward her at Middlebury. She forewarned the plaintiff of hostility toward feminism at the college.

On the recommendation of Professor Littlefield, Dr. Judith McDaniels was appointed to the Middlebury faculty after the plaintiff had left the college. She remained for two years. Her second contract was specifically designated a final appointment. At that time the defendant Armstrong explained by letter that when reappointment is made as a "leave appointment," as hers was, "there is no expectation that there will be further reappointment." Dr. McDaniels experienced no discrimination from the members of the English department. Indeed, they had recommended that she be reappointed, but the administration, as a policy consideration, would not extend a leave reappointment. Shortly thereafter Dr. McDaniels was appointed to the faculty of Skidmore College.

During the time Dr. McDaniels was at Middlebury and subsequent to the plaintiff's departure, the faculty and college administration adopted an affirmative action statement "as an act of good faith [of] its intent to comply with Title VII of the Civil Rights Act of 1964 as amended in 1972."[5] It included the following:

> Because the size of the Faculty at Middlebury College is by policy determination to remain relatively static, because the percentage of tenured fac-

---

5. In keeping with the clear Congressional intent in the 1972 amendment, to subject educational institutions to the mandate of the act, sex discrimination guidelines applicable to higher education employment have been issued from the Office of Civil Rights. These guidelines apply only to institutions with federal grants, and do not bear directly on this case. However, they do serve to define the position of the federal government in this area, and once again highlight the inherent conflict in sex discrimination cases. The Memoran-

dum to College and University Presidents states in part:

> Colleges and universities are entitled to select the most qualified candidate, without regard to race, sex, or ethnicity, for any position. The college or university, not the Federal Government, is to say what constitutes qualification for any particular position. No single appointment will be objected to where those not appointed are less well-qualified than the candidate actually selected. 40 Fed.Reg. 2460 (Jan. 13, 1975).

ulty is now almost as large as the College can sustain for academic and financial reasons in the foreseeable future, and because the number of faculty members retiring in the next decade is less than 10% of current faculty, the opportunity for recruiting women and minority colleagues is not as great as the College would like, the College, therefore, recognizes that it has a special responsibility to make every effort to recruit qualified women and minority group candidates when positions become available and under these circumstances of extraordinary complexity to act in a wholly equitable manner. (Pltf. Ex. 8).

The vacancy to which Dr. McDaniels sought appointment was later filled by a male applicant.

During the period 1966 to 1969, 26% of the candidates for the degree of Doctor of Philosophy were women. The court has not been informed concerning what proportion of this percentage were scholars in the field of Renaissance literature. Middlebury College engaged three women to teach Renaissance in the English department between 1968 and 1972; one male person was employed to teach the subject during this time.

During this period nine initial appointments were made to the English department, which included five men and four women. Of this group, two men and one woman, Ms. Barbara Crehan, remain. Ms. Crehan succeeded the plaintiff in teaching literature of the Renaissance and is presently serving the third year in the English department.

### Conclusion

The essence of the plaintiff's claim is that the failure of the defendants to reappoint her to the faculty of the college for the academic year of 1973–1974 constituted a violation of Title VII of the Civil Rights Act of 1964. By amendment in 1972 the Act was made applicable to educational institutions, removing the exemption afforded in the original enactment. Pub.L. 88–352 as amended by Pub.L. 92–261, Mar. 24, 1972. The plaintiff relies on that portion of § 703 of Title VII, which provides:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin;

. . . . 42 U.S.C. § 2000e–2.

Our concern is not one of hiring in the usual sense, nor with discharge, since the plaintiff's initial term and the renewal had expired according to the time period stated in the teaching contract of employment. The problem is presented in the context of the defendant's failure to tender a third one-year contract which the plaintiff had anticipated would be tendered her.

To prevail in her complaint against the college and its president, the plaintiff was called upon to establish (1) that she belongs to a minority group; (2) that she sought to be renewed in a position on the faculty for which she was qualified and which the college was seeking to fill; (3) that despite her qualifications, she was rejected; and (4) thereafter the position remained open and the college continued to seek applicants from persons with equivalent qualifications to those presented by the plaintiff. *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In the light of the statistics reported at the trial, the plaintiff, as a female person, was a member of a minority, in terms of male faculty members at Middlebury and elsewhere as to candidates for the doctoral degree of Ph.D. The defendant concedes that the position which the plaintiff sought to retain in teaching Renaissance literature, remained open for a while after Dr. Peters was informed that her appeal had been denied. The controversy centers on

whether the plaintiff was indeed qualified or whether the defendants' rejection on this basis was merely a pretext for a discriminatory refusal to renew her contract because she is a woman.

Title VII forbids not only open discrimination, but conduct which may appear to be fair, but, in effect, achieves a discriminatory result. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). It would be unusual indeed to find an occasion where the appointing authority of a college assigned a faculty member's sex as the reason for discontinuing a teacher's services in a particular department of the college. *Cf. Johnson v. University of Pittsburgh,* 359 F.Supp. 1002, 1008 (W.D.Pa.1973).

The evidence presented by Dr. Peters composed a *prima facie* case. Her academic scholarship in the area of Renaissance literature led to her initial selection and brought her to Middlebury in the first place. The plaintiff's evidence established a shortage of women on the college faculty, both in numbers and in terms of academic rank, that rendered her termination at least suspect. In this posture of the case the defendants presented substantial evidence of the deficiency of Dr. Peters' qualifications in the particular area of the English department for which she was primarily engaged. This was demonstrated by her teaching during her first contract and the first semester of her second year. The members of the English department were in the most advantageous position to assess the plaintiff's qualifications in the specialty for which she was hired. They were in substantial accord that the weakest point in the English department was Renaissance literature. Ms. Peters was unable to adequately lecture on John Donne and Ben Jonson and the department needed a better qualified person than the plaintiff to teach the subject in the advanced courses.

The student evaluation was varied, with support for Ms. Peters predominating. Yet their ability to evaluate in the advanced and specialized areas of the English department was not established. The reviewing authorities gave deference to the views advanced by the plaintiff's students.

The court recognizes that one or two members of the department on occasion, as with Dr. Gohlke, were unmindful or forgetful of the plaintiff's particular sensitivity toward feminism. Comments were made in her presence that to her, at least, were hurtful. These episodes engendered resentment in the plaintiff. They apparently inspired the belief on her part that her termination was motivated by hostile discriminatory considerations because of sex. But such comments on the part of an individual faculty member are not chargeable against the college administration. And there is no showing that the particular attitudes of such members of the department dominated the review procedures. The plaintiff's beliefs to the contrary are not supported by the evidence.

At the conclusion of the second contract the plaintiff was not replaced by a less qualified male; her position in the English department was filled by a highly qualified female person who has received a third year contract. This is entirely at variance with the situation alleged in *Weise v. Syracuse University,* 522 F.2d 397 (2d Cir. 1975).

Middlebury College has established definite procedures and criteria to govern decisions on appointment and reappointment to the faculty. Evaluation of a candidate for reappointment must be based on the professional competence and the promise of the person concerned, and on his or her value to the college community. Professional competence is measured primarily in terms of teaching.[6] These criteria are reasonable; they bear a rational relationship to the

---

**6.** The Middlebury College Handbook sets forth the required procedures and criteria for all college appointments and ranks. No claim has been presented that the decision about plaintiff's contract was not made in conformity with these guidelines.

duties of a college instructor and evidence indicates they were reasonably applied.

The defendant produced substantial evidence to indicate that the plaintiff's teaching was not satisfactory.[7] The decision not to reappoint the plaintiff was made according to prescribed procedures at the college; at each step plaintiff was given the same consideration as any instructor under consideration for reappointment and review. In fact, there is evidence to show that before the decision not to rehire became final, plaintiff's situation was more thoroughly reviewed than in the usual case. The Senior Faculty Council, responsible for reviewing recommendations of department chairmen on behalf of the president of the college, was aware of questions raised concerning plaintiff's political activities and made an effort to make certain that this was not the reason for the negative recommendation of the English department. When the plaintiff appealed the decision of non-reappointment, the administration scrupulously adhered to the procedural protection outlined in the Middlebury College Handbook. The testimony at trial of some of those called upon to review the plaintiff's qualifications, and the exhibits, make it appear that the plaintiff was given a fair hearing. It is clear that the dominant considerations in the decision not to grant the plaintiff a third contract were professional. The plaintiff's colleagues assessed her teaching as below standard for Middlebury. When this assessment was reviewed, the faculty committees concerned concluded that the plaintiff's

sex and her views on feminism were not the motivating factors.

■ An evaluation of one's teaching ability is necessarily a matter of judgment.

A professor's value depends upon his creativity, his rapport with students and colleagues, his teaching ability, and numerous other intangible qualities which cannot be measured by objective standards. *Lewis v. Chicago State College*, 299 F.Supp. 1357 (N.D. Ill.E.D.1969).

These considerations have induced reluctance in the courts to override the "rational and well-considered judgment of those possessing expertise in the field." *Green v. Board of Regents of Texas Tech. University*, 335 F.Supp. 249, 250 (N.D.Tex.1971), aff'd, 474 F.2d 594 (5th Cir. 1973). Absent an impermissible discrimination, the federal courts will not intrude to supervise faculty appointments and tenure. *Faro v. New York University*, 502 F.2d 1229 (2d Cir. 1974); *Lewis v. Chicago State College, supra.*

Clearly, the teaching position to which the plaintiff aspired for a third year was a demanding assignment requiring dedicated learning and scholarship in the field of Renaissance literature, as well as special teaching skills. Dr. Peters is an intensely dedicated and sensitive teacher. Yet the witnesses who addressed the point were in agreement that the final decision, not to offer Dr. Peters a third contract, was based on a professional judgment that her qualifications to teach the advanced courses in the English department of the college were inade-

---

7. Two non-tenured faculty members who interviewed Ms. Peters prior to her first appointment and who held high hopes for her competence in Renaissance literature were disappointed in her ability to handle the predominant literary figures of the Renaissance period, particularly John Donne and Ben Jonson. They felt the English department should make an effort "to find someone else who was better qualified to teach upper division courses in those areas."

In addition to the testimony of witnesses at trial, defendant's exhibits A through F indicate

that even those faculty members whose names were submitted by plaintiff, as witnesses to her competence, with one exception, were guarded in their statements of her abilities. These names were given to the Committee on Conference with the Trustees in the course of the plaintiff's appeal of non-reappointment. The notes of the committee indicate that these professors were either unable to evaluate the plaintiff's competence as a teacher of Renaissance literature, or assessed her qualifications negatively or with reservations.

quate. On the evidence presented, this was a decision which the defendants were lawfully entitled to make without judicial intervention.

The defendants have persuasively demonstrated that the refusal to grant the plaintiff a third year teaching contract was legitimately based on reasons that were not pretextually discriminating because of her sex. This constituted an adequate defense to the plaintiff's complaint within *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Since no violation of Title VII has been established, the plaintiff's claim for monetary and injunctive relief must be denied. *The Clerk will enter an order dismissing the complaint.*