Christine M. SWEENEY, Plaintiff, Appellee,

v.

BOARD OF TRUSTEES OF KEENE STATE COLLEGE et al., Defendants, Appellants.

Christine M. SWEENEY, Plaintiff, Appellant,

v.

BOARD OF TRUSTEES OF KEENE STATE COLLEGE et al., Defendants, Appellees.

Nos. 77–1243 and 77–1244.

United States Court of Appeals, First Circuit.

Argued Sept. 13, 1977.

Decided Jan. 4, 1978.

Joseph A. Millimet, Manchester, N. H., with whom Devine, Millimet, Stahl & Branch, Manchester, N. H., was on brief, for Board of Trustees of Keene State College et al.

Jack B. Middleton, Manchester, N. H., with whom Robert A. Wells, and McLane, Graf, Greene, Raulerson & Middleton Pro-

fessional Association, Manchester, N. H., were on brief, for Christine M. Sweeney.

Before COFFIN, Chief Judge, TUTTLE,* Circuit Judge and CAMPBELL, Circuit Judge.

TUTTLE, Circuit Judge.

This appeal presents important issues relating to the existence of discrimination against women in the awarding of promotions and the fixing of salaries at Keene State College. Dr. Christine Sweeney, a faculty member in the Department of Education at Keene since 1969, failed twice in her efforts to achieve promotion to the rank of full professor before finally succeeding in 1976. Attributing her earlier failures to sexual bias, she seeks a backdating of her promotion to the date of her first attempt and an accompanying adjustment in her salary for the intervening years. In addition, the plaintiff alleges that sex discrimination accounts for the disparity between the average salaries of males and females on the Keene faculty and claims that she has been paid less than men who carry a substantially equal workload.

Dr. Sweeney has brought suit under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e et seq., as amended by the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 86 Stat. 103; the Equal Pay Act of 1963, 29 U.S.C. § 206(d), as amended by the Education Amendments of 1972, 29 U.S.C. § 213(a), Pub.L. No. 92–318, 86 Stat. 235; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.; 42 U.S.C. § 1983, and the Fourteenth Amendment to the United States Constitution. Named as defendants are Keene State College, its Board of Trustees,[1] its president, and two former deans.

Following a four-day trial, the United States District Court for the District of New Hampshire ruled against Dr. Sweeney on the Equal Pay, § 1983, Fourteenth Amendment, and Title IX counts, but permitted her a partial recovery under Title VII. The district court found that Dr. Sweeney had been a victim of sex discrimination in her second effort to gain promotion and ordered her promotion backdated to 1975, with the appropriate back pay. The court also awarded the plaintiff attorneys' fees and costs of $17,766.56. Although the court specifically found a pattern of sex discrimination against females in hiring, promotion, and salaries, no injunction against further discrimination was issued.

In their appeal, the defendants seek to persuade this Court that the plaintiff's evidence was insufficient to prove a violation of Title VII. They further contend that Dr. Sweeney has failed to prove that a discriminatory motive accounted for her unsuccessful promotion attempt. Dr. Sweeney cross-appeals from certain adverse findings of fact and rulings of law, and particularly seeks reversal of the trial court's holding that she failed to prove sex discrimination as to her level of pay as an associate professor or professor. For the reasons discussed below, the judgment of the district court is affirmed.

I.

Keene State College, a division of the University of New Hampshire, is a small liberal arts college located in Keene, New Hampshire. Originally dedicated to the training of teachers, it presently grants bachelor's degrees in a variety of other fields as well as a master's degree in education. Dr. Sweeney earned a bachelor of education degree from Keene in 1943, a master of arts from Catholic University in 1956, and a Ph.D. from Catholic University in 1962. She taught at the primary and secondary levels from 1943 until 1960 and served as a graduate assistant at Catholic University in the 1961–62 school year. Appointed an instructor at Catholic University in 1962, Dr. Sweeney remained there until

---

* Of the Fifth Circuit, sitting by designation.

1. Keene State College is a division of the University of New Hampshire. The same Board of Trustees governs all of the divisions of the University of New Hampshire System.

1966, when she joined the faculty at Emmanuel College as an assistant professor. She was promoted to the rank of associate professor at Emmanuel, effective in the fall of 1968, with an anticipated salary of $9,000, but left that school before the start of the 1968–69 academic year. In January, 1969 Dr. Sweeney was appointed an associate professor of education at Keene and received $5,000 for the spring semester. Her initial position was supervisor of student teaching, but she has subsequently assumed various other teaching responsibilities in the department of education. In addition to her course load, Dr. Sweeney has served on numerous college and department committees and on the Professional Standards Board for the State Board of Education. This summary of her credentials is by no means exhaustive but suffices to demonstrate that Dr. Sweeney possesses the education and experience typical of college teachers.

From the record it appears that Dr. Sweeney's career at Keene went smoothly until 1971. In the spring of that year, she was selected by a committee within her department to accompany a group of students to England the following fall. The trip was part of a student exchange program developed by the Department of Education, and Dr. Sweeney had been quite active in the program. At the time of the plaintiff's selection, a man was selected for a second fall trip and another woman was selected as an alternate. Final approval of the faculty advisors rested with Dean Clarence Davis, and he refused to permit Dr. Sweeney to make the trip, selecting the alternate instead. Although the dean refused to tell the plaintiff his reasons for this decision, he testified at trial that he had acted upon the recommendation of the coordinator of the program, a female, who had advised him that the alternate was better qualified.

Plaintiff attempted to convince the trial court that this decision resulted from sex discrimination by showing that no women have been selected for subsequent trips and that no men have been disapproved. However, the trial court specifically found that the dean's decision rested on factors other than sex discrimination. This fact finding is amply supported by the evidence, because a woman took Dr. Sweeney's slot and the unfavorable recommendation came from a woman. Nevertheless, the incident plays a role in later developments and is mentioned for that reason. Dr. Sweeney testified that the incident alerted her to the possible existence of sex bias on campus. More importantly, she feared that the refusal to permit her to make the trip would affect her later efforts to seek promotion.

In spite of the England incident, Dr. Sweeney was granted tenure in 1972 with no apparent difficulty. In the 1972–73 academic year, she sought promotion to the rank of full professor, the highest rank in the academic setting.[2] Like many other colleges and universities, Keene employs a peer-review system for screening requests for tenure and promotion. These requests, initiated either by the faculty member or by the department chairman on behalf of the faculty member, are sent to the dean of the college, who, in turn, forwards the matter to the Faculty Evaluations Advisory Committee (FEAC), a five-member panel elected each year by the entire faculty from persons in the highest two academic ranks. The FEAC measures the record and qualifications of the applicant against the standards set forth in the faculty manual[3] and makes a recommendation to the dean either for or against promotion. Although the FEAC functions in an advisory capacity, its recommendations are usually adopted by the dean. If the FEAC recommends pro-

2. The normal progression in academic rank is from instructor to assistant professor, associate professor, and, finally, full professor.

3. The criteria specified in the faculty manual for promotion are teaching effectiveness, scholarly qualifications, service to the college, and community activities. The Faculty Senate has issued guidelines for interpreting these criteria. In addition, a teacher must normally spend a minimum number of years in one rank before ascending to the next level. For promotion to the rank of full professor, the faculty manual calls for four years as an associate professor.

motion and the dean concurs, the request is sent to the Board of Trustees for final approval. If, however, the dean concurs in a negative FEAC recommendation, the applicant can seek reconsideration by the dean and the FEAC. If still unsuccessful, an appeal can be taken to the Faculty Appeals Committee (FAC), also composed of elected faculty members. This panel's authority is limited to determining whether due process has been accorded or whether new evidence has been presented. The FAC presents its findings to the college president, who in turn submits any favorable recommendations to the Board of Trustees. The president expressed a reluctance to overturn an FEAC decision unless the FAC found arbitrary or unfair action.

The plaintiff was recommended for promotion by her department and its chairman, Dr. Paul Blacketor, during the 1972–73 school year.[4] An all-male FEAC voted unanimously against promotion and Dean Davis concurred. Dr. Sweeney was given no reasons for the adverse decision. Upon the advice of Dean Davis, Dr. Sweeney secured letters of support from faculty members and persons outside Keene to assist the FEAC in its reconsideration, but to no avail. The plaintiff appealed to the FAC in July 1973, citing the lack of reasons as evidence of unfairness. In a letter to President Leo Redfern eight months later, the FAC stated that the FEAC had refused to explain its adverse decision and that Dean Davis had declined to discuss his disapproval of Sweeney for the England trip. Therefore, the committee could not determine whether the trip incident had influenced the FEAC decision. Giving Dr. Sweeney the benefit of the doubt on the question of unfairness, the FAC strongly recommended that Dr. Sweeney be con-

sidered by the current (1973–74) FEAC even though she herself had not initiated a new request for promotion during that academic year because of her pending appeal. The president declined to permit what he viewed as a short-circuiting of normal procedures and notified the FAC in April of 1974 of his decision. Shortly thereafter, Sweeney filed charges of sex discrimination with the New Hampshire Commission of Human Rights and the EEOC.

The plaintiff sought promotion again during the 1974–75 academic year. A new FEAC, entirely male, voted against her promotion and the dean once again concurred. This time, however, the dean informed the plaintiff by letter that the decision was based on her failure to meet the qualifications enunciated in the faculty manual and he quoted a portion of it to her.[5]

Alleging sex discrimination in her second appeal to the FAC, Dr. Sweeney submitted additional information to that committee to counter each of the objections cited by Dean Davis. After examining her case, the FAC sent a lengthy letter to President Redfern decrying the unprofessional treatment of the plaintiff and insisting that she be given more detailed reasons for the adverse decision. The FAC, one of whose members was a woman, also stated that it had been unable to find evidence of sex discrimination.[6]

As a result of this prodding by the FAC, President Redfern conferred with Dean Davis and former FEAC members to ascertain the grounds for her nonpromotion. The list of criticisms which the president conveyed to Dr. Sweeney included allegations that she had narrow, rigid, and old-fashioned views, tended to personalize professional matters, kept minutes of the graduate fac-

4. The promotion would have been effective July 1973. By that time Dr. Sweeney would have met the requirement for serving four years before promotion. See note 3, *supra*.

5. The dean's letter stated:
This decision is based upon the evaluation of FEAC which indicates that you have not fulfilled the qualifications as stated in the Faculty Manual; namely, that your teaching and

research has [sic] not been "marked by the perspective of maturity and experience, or by some creative attribute generally recognizable in the academic world as a special asset to a faculty."

6. The testimony at trial indicated, however, that the FAC did not undertake an exhaustive investigation into the sex discrimination charge.

ulty meetings which fell below a professional caliber, and emphasized to her students the importance of maintaining an even height of window shades in a classroom.[7] This meeting of the plaintiff and President Redfern, which occurred in November 1975, apparently marked the end of her second appeal.

Dr. Sweeney's third try for promotion, during the 1975–76 academic year, was successful. The FEAC, composed of four men and a woman, voted unanimously in her favor only a few months after the plaintiff's meeting with the president. Her promotion was effective July 1, 1976.

At trial, the plaintiff presented statistical evidence to substantiate her claim of sex discrimination. She and other witnesses testified about specific instances of allegedly sex-biased treatment. Experts in the areas of education and sex discrimination were also called to testify. In a lengthy opinion which contains a thorough review of the testimony and exhibits, the district court found that the evidence established a pattern of sex discrimination at Keene State College in hiring, promotion, and salaries. Applying the approach employed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the district court held that the plaintiff had established a prima facie case of sex discrimination in her second promotion effort in violation of Title VII and that the defendants had not rebut-

ted her evidence. Based on the plaintiff's qualifications, length of time at Keene, and her rapport with her colleagues, the court believed that Dr. Sweeney would not have been promoted in her first try even if she had been a male. Although the court found that the defendants applied a double standard in salaries, hiring, and promotion, the court held that the plaintiff had failed to prove that her own salary was less than males with the same or similar qualifications and responsibilities. The district court also found that Keene's affirmative action program was ineffective.

## II.

█ The defendants strenuously argue on appeal that Dr. Sweeney has provided insufficient proof of discriminatory motivation to support a finding of disparate treatment. We recognize that disparate treatment cases, such as this one, differ from disparate impact cases, such as *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).[8] We also recognize that proof of discriminatory motive is critical in a disparate treatment case. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This is necessarily so because the gist of a disparate treatment claim is that an employee has been treated less favorably than others because of race,

---

**7.** This last criticism was characterized by some witnesses as an insulting joke often made flippantly about teachers. Dr. Redfern, however, stated that he had taken it as a serious assessment of her attitudes.

**8.** The distinction between disparate treatment and disparate impact cases was explained by the Supreme Court in *International Brotherhood of Teamsters v. United States*:

"Disparate treatment" such as alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. *Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.* . . .
Undoubtedly disparate treatment was the

most obvious evil Congress had in mind when it enacted Title VII. . . .

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involves employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. . . . Proof of discriminatory motive, we have held, is not required under a disparative impact theory. Compare, e. g., *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–432, 91 S.Ct. 849, 28 L.Ed.2d 158, with *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–806, 93 S.Ct. 1817, 36 L.Ed.2d 668.
431 U.S. 324, 335–36, n. 15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977) (citations omitted) (emphasis added).

color, religion, sex, or national origin. What we reject is an effort by the defendants to elevate the quantum of proof to such a level that a litigant is necessarily doomed to failure.

The Supreme Court has never said that an individual plaintiff seeking to establish a claim of disparate treatment in violation of Title VII must present direct evidence of discriminatory intent. Even in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which held that discriminatory intent is an essential element of a claim based upon the equal protection clause of the Fourteenth Amendment, the Supreme Court recognized that circumstantial evidence was one means of proving purposeful discrimination. The Court stated in *Davis*:

> Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact . . . may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds.

426 U.S. at 242, 96 S.Ct. at 2049.

Particularly in a college or university setting, where the level of sophistication is likely to be much higher than in other employment situations, direct evidence of sex discrimination will rarely be available. The Congress was no doubt aware of this fact when it extended Title VII to colleges and universities for the first time in 1972.[9] The legislative history contains numerous indications of Congress' concern for the status of women in academia.[10] Statistical evidence presented to the Congress at that time made glaringly clear that "[w]hen they have been hired into educational institutions, particularly in institutions of higher education, women have been relegated to positions of lesser standing than their male counterparts."[11] Legislative concern over this sexual imbalance is further evidenced in the passage of Title IX of the Education Amendment of 1972, 20 U.S.C. § 1681 (Supp.IV, 1974).

■ Of course, legislative sympathy for the plight of female college teachers does not alleviate Dr. Sweeney's obligation to prove herself the victim of sex discrimination in order to recover under Title VII. In fact, the difficulty of her task is underlined by the lack of cases in which plaintiffs have succeeded in similar challenges to sex discrimination in academia. Admittedly, most if not all of these female plaintiffs have lost. *Keyes v. Lenoir Rhyne College,* 552 F.2d 579 (4th Cir.), *cert. denied,* —— U.S. ——, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977); *Faro v. New York University,* 502 F.2d 1229 (2d Cir. 1974); *Green v. Bd. of Regents of Texas Tech University,* 474 F.2d 594 (5th Cir. 1973) (suit under § 1983); *Johnson v. University of Pittsburgh,* No. 73–120 (W.D. Pa., dec. Aug. 1, 1977), dissolving preliminary injunction issued in 359 F.Supp. 1002 (W.D.Pa.1973); *Peters v. Middlebury College,* 409 F.Supp. 857 (D.Vt.1976); *Van deVate v. Boling,* 379 F.Supp. 925 (E.D.Tenn.

---

**9.** Title VII, as originally enacted, contained an exemption for the employment practices of educational institutions as to teachers. The Equal Employment Opportunity Act of 1972, 86 Stat. 103, § 3 (1972), eliminated the exemption and also extended Title VII to state and federal governments.

**10.** A portion of the House Report states:

> There is nothing in the legislative background of Title VII, nor does any national policy suggest itself to support the exemption of these educational institution employees— primarily teachers—from Title VII coverage. Discrimination against minorities and women in the field of education is as pervasive as discrimination in any other area of employment.

H.Rep. No. 92–238, 92nd Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News p. 2155.

> Senator Bayh found the evidence of sex discrimination in colleges and universities "truly appalling." 118 Cong.Rec. 117 (1972) (remarks of Senator Bayh). Senator Williams characterized it as "gross" and "blatant." 118 Cong.Rec. 1992 (1972) (remarks of Senator Williams).

**11.** H.Rep. No. 92–238, 92nd Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Admin. News p. 2155.

1974). Whether the evidence presented in these cases fell significantly short of the evidence in this case we do not know.[12] However, we voice misgivings over one theme recurrent in those opinions: the notion that courts should keep "hands off" the salary, promotion, and hiring decisions of colleges and universities.[13] This reluctance no doubt arises from the courts' recognition that hiring, promotion, and tenure decisions require subjective evaluation most appropriately made by persons thoroughly familiar with the academic setting.[14] Nevertheless, we caution against permitting judicial deference to result in judicial abdication of a responsibility entrusted to the courts by Congress. That responsibility is simply to provide a forum for the litigation of complaints of sex discrimination in institutions of higher learning as readily as for other Title VII suits.

### A.

■ It is clear from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *International Brotherhood of Teamsters v. United States,* 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), that an individual plaintiff who alleges disparate treatment because of her sex must prove that her unfavorable treatment was sexually premised. Both of those cases explore the nature of proof and the allocation of the

**12.** The cases which have reached the Court of Appeals level all presented plaintiffs appealing from unfavorable findings of fact. Therefore, the appeals were controlled by the "clearly erroneous" standard of appellate review. Fed. Rule Civ.P. 52(a). *See, e. g., Faro v. New York University,* 502 F.2d 1229 (2d Cir. 1974). By contrast, several of the fact findings in this case favored Dr. Sweeney and the "clearly erroneous" standard works to her advantage.

**13.** The Court of Appeals for the Second Circuit expressed this viewpoint in *Faro v. New York University,* 502 F.2d 1229, 1231–32 (2d Cir. 1974):

> Of all fields, which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision. Dr. Faro would remove any subjective judgments by her faculty colleagues in the decision-making process by having the courts examine "the university's recruitment, compensation, promotion and termination and by analyzing the way these procedures are applied to the claimant personally" (Applt's Br. p. 26). All this information she would obtain "through extensive discovery, either by the EEOC or the litigant herself" (*Id.*). This argument might well lend itself to a *reductio ad absurdum* rebuttal. Such a procedure, in effect, would require a faculty committee charged with recommending or withholding advancements or tenure appointments to subject itself to a court inquiry at the behest of unsuccessful and disgruntled candidates as to why the unsuccessful was not as well qualified as the successful. This decision would then be passed on by a Court of Appeals or even the Supreme Court. The process might be simplified by a legislative enactment that no faculty appointment or advancement could be made without the committee obtaining a declaratory judgment naming the successful candidate after notice to all contending candidates to present their credentials for court inspection and decision. This would give "due process" to all contenders, regardless of sex, to advance their "I'm just as good as you are" arguments.

*But see Egelston v. State University College at Genesco,* 535 F.2d 752 (2d Cir. 1976) (cautions against hasty dismissal of complaint when plaintiff has stated valid Title VII claim).

**14.** In "blue collar" employment situations courts have tended to view subjective criteria with suspicion. For example, in *Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir. 1972), a black employee complained that his promotion hinged on receiving a favorable recommendation from a foreman, all of whom were white. The Court of Appeals for the Fifth Circuit recognized that subjective criteria contain "no safeguards . . . to avert discriminatory practices" and provide "a ready mechanism for discrimination . . . much of which can be covertly concealed." *Id.* at 359. See also *Wade v. Mississippi Coop. Extension Serv.,* 528 F.2d 508 (5th Cir. 1976).

Of course, subjective evaluations are essential in certain positions. *See Rogers v. International Paper Co.,* 510 F.2d 1340 (8th Cir. 1975) (subjective criteria not unlawful per se). Judicial tolerance of subjective criteria seems to increase with the complexity of the job involved. *See Peters v. Middlebury College,* 409 F.Supp. 857 (D.Vt.1976). Assessment of teaching ability clearly is a matter of subjective judgment. "A professor's value depends upon his creativity, his rapport with students and colleagues, his teaching ability, and numerous other intangible qualities which cannot be measured by objective standards." *Lewis v. Chicago State College,* 299 F.Supp. 1357, 1359 (N.D.Ill.1969).

burden of proof in cases alleging disparate treatment. Neither requires *direct* proof of discriminatory motive.

■ As we understand those cases, a plaintiff bears the initial burden of presenting evidence sufficient to establish a prima facie case of discrimination. The burden then shifts to the defendant to rebut the prima facie case by showing that a legitimate, non-discriminatory reason accounted for its actions. If the rebuttal is successful, the plaintiff must show that the stated reason was a mere pretext for discrimination.[15] The ultimate burden of persuasion on the issue of discrimination remains with the plaintiff, who must convince the court by a preponderance of the evidence that he or she has been the victim of discrimination. *King v. Yellow Freight System,* 523 F.2d 879 (8th Cir. 1975); *Naraine v. Western Electric Co.,* 507 F.2d 590 (8th Cir. 1974).

The quantum of proof sufficient to constitute a prima facie case cannot be expressed in any general rule.[16] In *McDonnell Douglas,* where the plaintiff alleged that racial discrimination motivated his employer's refusal to rehire him after he had participated in an illegal stall-in, the Supreme Court found that a prima facie case had been made out by the plaintiff's showing that he belonged to a racial minority, that he was a qualified applicant for an existing job opening, that he was rejected despite his qualifications, and that the employer continued to seek applicants of his qualifications for the job opening after his rejection. 411 U.S. at 802, 93 S.Ct. 1817. These requirements do not impress us as imposing a very arduous burden upon a plaintiff. Moreover, in requiring the defendant to prove absence of discriminatory motive, the Supreme Court placed the burden squarely on the party with the greater access to such evidence.[17] In suggesting the kinds of evidence which would be relevant in proving that the employer's refusal to rehire was a pretext, the Court listed an employer's general policy and practice with respect to minority employment, prior treatment of the plaintiff, and statistics. 411 U.S. at 804–05, 93 S.Ct. 1817.

A combination of statistics and specific instances of discrimination provided sufficient evidence of discrimination in *Teamsters.* There the Court reiterated the importance of statistics in proving employment discrimination:

> We have repeatedly approved the use of statistical proof, where it reached proportions comparable to those in this case, to establish a prima facie case of racial discrimination in jury selection cases . . . Statistics are equally competent in proving employment discrimination. We caution only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances.

431 U.S. at 433, 97 S.Ct. at 1856 (footnote and citations omitted).

■ It is clear, then, that a plaintiff may rely upon inferential proof of discriminatory motive in a disparate treatment case. *Muller v. U. S. Steel Corp.,* 509 F.2d 923 (10th Cir. 1975); *Marquez v. Omaha District Sales Office, Ford Division,* 440 F.2d 1157 (8th Cir. 1971); *Jones v. Lee Way Motor Freight, Inc.,* 431 F.2d 245 (10th Cir. 1970); *Blue Bell Boots, Inc. v. EEOC,* 418 F.2d 355 (6th Cir. 1969). We turn now to an analysis of the evidence in the instant case.

---

**15.** We do not read *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), as altering *McDonnell Douglas.* In *Gilbert* the Court found that the plaintiff had not shown a disproportionate impact on women as a result of the employer's exclusion of pregnancy disabilities from a health insurance plan. The issue of disparate treatment was not involved.

**16.** As the Supreme Court noted in *McDonnell Douglas:* "The facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n. 13, 93 S.Ct. at 1824.

**17.** *See* Cleary, *Presuming and Pleading: An Essay on Juristic Immaturity,* 12 Stan.L.Rev. 5 (1959).

### B.

█ Dr. Sweeney clearly showed that she was a member of a protected class within Title VII, that she was qualified for promotion,[18] that she was rejected, and that others of her qualifications were promoted. She went further and presented statistical evidence which supports an inference of sex bias in promotion decisions. Most persuasive of the statistics was the fact that only four women in the entire history of Keene State College have achieved the rank of full professor. There have never been more than two women professors in any given academic year and this has occurred in only two years since 1968. In all other years since 1968, only one woman occupied the top rank. In contrast, the number of male professors has gone from ten in 1969-70[19] to 23 in 1975-76. A similarly striking discrepancy exists in the rank of associate professor. There were only three female associates in 1969-70 and six in 1975-76, while the males in that rank numbered 17 in 1969-70 and 35 in 1975-76. While women represent approximately 20% of the faculty, a figure which compares fairly favorably with the percentage of women in the applicable labor pool, males held slightly more than 90% of the full professor slots in 1969-1970 and 92% in 1975-76. In fact, there have been more male professors than male instructors every year since 1969-70, despite the defendants' insistence that entry to the top rank is a significant achievement reserved for the excellent few.

In spite of their overall percentage on the faculty, women presently outnumber men in the instructor level. While many of the women in these lower levels may be new faculty members, that still does not account for the striking imbalance in the upper ranks. Moreover, the evidence showed that while men had been appointed to the faculty as full professors on many occasions since 1969, no woman has ever been appointed initially above the rank of associate professor. This fact supports the district court's finding of a pattern of discriminatory hiring. Dr. Sweeney also showed that no female has ever been promoted to the highest rank without a terminal degree, while several male professors do not possess such a degree. This statistical evidence supports the district court's finding that a double standard was applied in promotion decisions. The evidence also showed that women were underrepresented in the English, Art, History, Biology, Psychology and Industrial Education Departments.

The defendant attempted to rebut these statistics by pointing to highly qualified men who remained in the lower ranks longer than Dr. Sweeney. While this evidence is informative, the district court was not required to find that it totally dispelled the inference of discrimination created by the other statistics. Likewise, evidence of males who failed to be promoted on their first try does not necessarily rebut the inference of the plaintiff's more striking statistics. At best, these tales of individual males' struggles account for the district court's conclusion that Dr. Sweeney would not have achieved promotion in her first

---

18. The very fact of Dr. Sweeney's ultimate promotion demonstrates that she was qualified for promotion. The record does not reveal any significant change in her credentials from 1973 to 1976, although she did become more active in Keene's reading program. Because the plaintiff carried this insignia of collegiate approval into her trial, the district court was not required to serve as super-FEAC in passing upon her qualifications. Furthermore, several witnesses testified that Dr. Sweeney was qualified for promotion as early as 1973.

19. The figures quoted here were distilled by the district court from answers to the plaintiff's interrogatories. The plaintiff's brief contains slightly different figures. The differences apparently occurred because the district court excluded the teaching laboratory, the school library, student services auxiliary enterprises, and the administration from its figures, while the plaintiff tabulated statistics for the total number of academic employees. The plaintiff's table shows:

| Year | Instructor | | Assistant Professor | | Associate Professor | | Full Professor | |
|------|---|---|---|---|---|---|---|---|
| | F | M | F | M | F | M | F | M |
| 1969–1970 | 11 | 14 | 8 | 35 | 4 | 15 | 1 | 13 |
| 1970–1971 | 14 | 13 | 10 | 35 | 4 | 23 | 2 | 15 |
| 1971–1972 | 13 | 15 | 9 | 39 | 3 | 23 | 1 | 17 |
| 1972–1973 | 17 | 16 | 11 | 40 | 3 | 25 | 1 | 18 |
| 1973–1974 | 14 | 9 | 5 | 34 | 6 | 26 | 1 | 19 |
| 1974–1975 | 14 | 9 | 7 | 40 | 9 | 34 | 1 | 22 |
| 1975–1976 | 11 | 5 | 13 | 42 | 8 | 36 | 2 | 24 |

effort even if she had been a male. It is true that the defendants were able to find instances where an individual male of superior qualifications encountered difficulties in reaching the level of professor. But these examples were countered by other situations where females fared worse. In short, the plaintiff did not prove the existence of a completely consistent pattern, but she offered sufficient evidence to sustain the district court's findings.

Nor can defendants hope to disprove a discriminatory pattern by claiming that they chose outstanding male faculty members for promotion, for "affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion." *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972). The scarcity of women in the upper ranks accounts for their frequent lack of representation on the FEAC and the FAC. The racial or sexual composition of a body which makes subjective evaluations has often been considered a factor in employment discrimination cases. *See Stewart v. General Motors Corp.,* 542 F.2d 445 (7th Cir. 1976); *United States v. N. L. Industries,* 479 F.2d 354 (8th Cir. 1973).

In addition to statistical evidence, Dr. Sweeney presented testimony concerning other instances from which sex discrimination could be inferred.[20] An important part of her case centered around the ineffectiveness of Keene's affirmative action effort. Although a faculty committee drafted an affirmative action plan in 1973, no such plan was officially adopted until 1976. The current plan, in the form presented to the district court, does not even address the questions of salary and promotion. Moreover, the testimony reveals that the person who nominally served as affirmative action coordinator did virtually nothing to advance the rights of women on the Keene campus. He admitted as much in his own testimony.

Certainly the most striking evidence presented in this context concerned the affirmative action coordinator's response to Dr. Sweeney's filing of charges with the State Human Rights Commission. Not only did he attempt to get the plaintiff to answer the interrogatories sent to Keene by the Human Rights Commission, a measure which cannot be condoned, he also wrote to the president of Smith College for information on how that school had responded to a charge of sex discrimination because he was "concerned that that form of anarchy may creep north into our virgin territory."

Various witnesses also testified that in their opinion sex bias influenced promotion decisions at Keene. This bias may often be unconscious and unexpressed, but its potential for harm is greatest in reaching decisions on the basis of criteria which simply cannot be objectively measured or definitively stated.

From our careful review of all the evidence we conclude that the trial court's finding that sex discrimination impeded the plaintiff's second promotion effort was not clearly erroneous.

■ With regard to the court's finding against the plaintiff on the issue of salary discrimination, we likewise hold that the fact-findings were not clearly erroneous. Dr. Sweeney presented statistical evidence which demonstrated that the average salaries of women fell below those of men in each rank in almost every year. This evidence persuaded the district court that a pattern of sex discrimination in compensation existed. However, Dr. Sweeney did not offer any proof of what her salary would have been but for the discrimination. Nor did she explore deeply enough the various elements which influenced salary amounts so as to enable the district court to determine to what extent sex or other factors contributed to the amount of her compensation. From the record it is clear that merit, longevity, experience, and availabili-

---

**20.** Some parts of this evidence were less persuasive than others. For example, the references to women as "girls" in some personnel files and the existence of a distaff club open to faculty wives and female faculty members may be indicative of outdated thinking but would hardly, without more, prove a case.

ty of funds all influenced the salary level. It is also certain that Keene State College has made no effort to standardize salary levels within a given rank or department. It is difficult to attribute a lower salary to any one factor in the absence of more particularized comparative evidence. Moreover, Dr. Sweeney's salary was lower than the female average, so the court could have inferred that her sex did not affect her pay.

Because we leave this fact-finding undisturbed, it is not necessary for us to reach the issue of whether the Equal Pay Act is applicable to this kind of case and whether it can be constitutionally applied to a state college. *See National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

Furthermore, in light of the fact-findings made by the district court, Dr. Sweeney would gain nothing from reversal of her § 1983 and Fourteenth Amendment claims or from a holding on the issue of whether Title IX creates an implied cause of action. Title VII suffices to make her whole to the extent she is entitled to relief. We express no opinion on these undecided issues.

 We also affirm the award of attorneys' fees, costs, and expenses. The amount is reasonable in light of the factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). The district court exercised its discretion properly in fixing the amount and in subtracting 20%. A party who prevails in part may still be awarded attorneys' fees. *Batiste v. Furnco Construction Corp.,* 503 F.2d 447 (7th Cir. 1974), *cert. denied,* 420 U.S. 928, 95 S.Ct. 1127, 43 L.Ed.2d 399 (1975).

The judgment is AFFIRMED.

LEVIN H. CAMPBELL, Circuit Judge (concurring).

I agree with the result, but the tone of the court's opinion leaves me uneasy. By emphasizing the "importance" of the instant case and then dealing with such collateral questions as whether the intent requirement of *Washington v. Davis* applies to Title VII cases, and the duty of courts not to defer unduly to universities' personnel policies, an impression is generated that this circuit may endorse the use of a sword rather than a scalpel in cases of this delicate nature. In my view the instant case gives rise to no issue of first impression nor does it require taking a philosophical stance on the importance of women's rights *vis a vis* those of a university administration. The question is mainly the traditional one of whether the district court's findings in a close case were clearly erroneous. As they were not, we properly affirm.

My reason for eschewing my brothers' more fulsome approach is my fear that it detracts from what I believe to be the central issue in all such cases as this—the need for the most objective, sensitive fact-finding humanly possible. Fact-finding biased in either direction can lead to socially harmful results: harm to the woman who is discriminated against without redress; harm, on the other hand, to a university and its students, and to more qualified applicants, if a lifetime job or promotion is conferred by the court upon a woman who would have been passed over had she been a male. All that a court says in the occasional sex-discrimination case that reaches it sets the pattern for myriad out-of-court dispositions. It behooves us to make clear that Title VII requires courts to be unflinching in upholding *both* the rights of the victims of sex discrimination *and* the right of universities and other employers to make sex blind discretionary decisions—even if a woman sometimes loses out. *See, e. g., Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222 (1st Cir. 1976).