Alice Madeleine LABORDE and all other persons similarly situated, Plaintiffs,

v.

The REGENTS OF The UNIVERSITY OF CALIFORNIA, Defendant.

No. CV–78–1662 (Hatfield).

United States District Court,
C. D. California.

May 19, 1980.

Lada S. Marx, John G. Sobieski, Los Angeles, Cal., for plaintiffs.

Christine Helwick, John F. Lundberg, Berkeley, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HATFIELD, District Judge.

Plaintiff Alice Laborde, tenured Associate Professor in the French and Italian Department on the Irvine campus of the University of California, seeks redress for an alleged violation of her rights as protected under the Civil Rights Act of 1964, Title VII. Her claim was spurred, in essence, by the University's refusal to promote plaintiff to the rank of full professor beginning in 1975. Plaintiff alleges defendants' failure to promote her was based on reasons of sex and national origin.

At the conclusion of this non-jury case, the Court requested that the parties simultaneously submit post-trial briefs addressing, in part, a Rule 41(b) motion for dismissal and a motion to strike certain documentary evidence. Prior to setting forth the findings the Court hereby rules on the above motions.

The motion for dismissal under Rule 41(b), F.R.Civ.P., made after presentation of plaintiff's evidence is hereby denied upon the grounds and for the reasons that the Court cannot find that the facts and law as presented by plaintiff clearly show the plaintiff has no right to relief.

Further, the motion to strike from evidence Exhibits 12, 49–51, 55–62, 64, 66 and 73 is hereby GRANTED. The Court has garnered from plaintiff's post-trial pleadings that she only opposes striking exhibits 55–62 since she has failed to discuss the remaining exhibits. Exhibits 55–62 relate to publication of plaintiff's book by the University of California Press. The Court finds that they are not relevant to the claim for relief and they are accordingly stricken.

With the foregoing rulings made, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.

Plaintiff is a naturalized citizen, born in Algeria and of French national origin. She was employed by defendants as an Assistant Professor Step I from July 1965 through June 30, 1967; as an Assistant Professor Step II in 1967; as an Assistant Professor Step III in 1968; and as an Assistant Professor Step IV in 1969. Plaintiff received tenure as an Associate Professor Step I in 1970. She was promoted to Associate Professor Step II in 1972; Associate Professor Step III in 1974; Associate Professor Step IV in 1976; and Associate Professor Step V on July 1, 1979.

### II.

Defendants, The Regents of the University of California (hereafter "University"), is a corporation duly organized and existing under and by virtue of Article IX, section 9 of the California Constitution. It is authorized and empowered by that section of the California Constitution to administer a public trust known as the University of California, of which the University of California, Irvine is one campus.

### III.

Plaintiff's action is based upon the Civil Rights Act of 1964, Title VII, as amended 42 U.S.C. §§ 2000e, *et seq.* Plaintiff claims that defendants unlawfully discriminated against her on the basis of sex and French national origin. Plaintiff seeks redress in the form of a promotion to Full Professor as of the 1975–76 academic year, back pay, broad remedial injunctive relief and attorney's fees.

### IV.

Defendants maintain a procedure of confidential peer review for promotion within certain academic ranks including that occupied by the plaintiff, the rank of Associate Professor, the second highest tenured position within the University. The procedure

is set forth in writing in detail and provides for multiple levels of review including review by the department of which the candidate is a member, review by intra- and extramural scholars, review by the Dean of the particular school, review by an Ad Hoc Review Committee, review by the Committee on Academic Personnel, and finally, review and decision by the Chancellor of the campus.[1] The system of review is confidential for it is believed that such confidentiality assures candid and objective evaluations from which the most equitable determinations for promotion can be made. While confidentiality of peer review records is the rule, there are internal safeguards to protect against abuse, including the number of reviewers involved in each academic determination, the independence of the various levels of review, intra- and extramural reviewers, the right of a candidate to request that particular reviewers be asked to submit evaluations, review by committee thereby eliminating any individualized arbitrary decisions, employment of an affirmative action officer at each campus to oversee academic review, the right of a candidate to obtain a written summary of confidential records, and finally, the right to complain before the Committee on Privilege and Tenure, a peer committee appointed by the Academic Senate of the faculty on the Irvine campus.

## V.

During the 1973–74 academic year, plaintiff was reviewed for an accelerated promotion from Associate Professor Step II to full professor. Plaintiff's department supported the promotion after a book which plaintiff had written was accepted for publication. However, plaintiff did not receive her promotion to full professorship; rather, she received a merit increase to Associate Professor Step III. Plaintiff is not seeking relief based upon denial of promotion in the 1973–74 academic year.

## VI.

In the 1975–76 academic year, plaintiff was again reviewed for promotion. The review was in accordance with Academic Personnel Rules of the University. All of the extramural evaluators suggested by the plaintiff were contacted. Each of these evaluators was sent a full and complete biography of the plaintiff. The plaintiff reviewed the nonconfidential materials in her file. Although plaintiff complained that she was not given the reasons why she was not promoted, Dean William Lillyman testified that he explained to plaintiff the reasons promotion was denied. The reasons mostly pertained to plaintiff's scholarship. As a result of the 1975–76 review for promotion, plaintiff was given a merit increase to Associate Professor Step IV.

## VII.

In the 1976–77 academic year, the plaintiff requested review for promotion from Associate Professor Step IV to full professor. There was no new scholarly material in plaintiff's file and thus the same outside scholars were used as had been used during the 1975–76 review. Since there was no new scholarly material, and after having supported plaintiff twice and having been turned down twice, the recommendation of her French and Italian Department was that no action be taken. Plaintiff was again denied a full professorship for the 1976–77 academic year.

## VIII.

Plaintiff requested review for promotion again in the 1977–78 year. Four extramural letters were solicited and received. Three of these were from scholars suggested by the plaintiff. One of the scholars was a woman. A February 1977 letter written by the Department Chairman stated "The Department does not wish to support a recommendation for promotion to Full Professor at this time." Therefore, there was a "no action" recommendation by the Department. Plaintiff was provided a summary of material in accordance with Academic Personnel Manual Rule 195, which had gone

---

1. See Appendix 1 for a flow chart of the process of academic personnel review.

into effect September 15, 1977. This Rule changed the process of academic review so as to provide a candidate under review for promotion with a disaggregated summary of the substance of confidential material in the file, including the recommendation of the Department. Although the candidate may request a complete summary, a departmental summary is provided automatically under the Rule. Plaintiff responded to the departmental summary and the response was made an official part of her review file. By fall, 1978, a new manuscript had been prepared by plaintiff and since no definitive decision had been made, eight new scholars were selected for review. Three of these people were suggested by the plaintiff and two were women. The Department decision was a split vote for promotion, but there was agreement that plaintiff should receive a merit increase to Associate Professor Step V which was given effective July 1, 1979.

### IX.

The summaries of the eight extramural scholars contacted in the fall of 1978 provide a mixed picture of plaintiff's scholarship. There was evidence that some of the scholarly works of Professor Laborde were marked by weaknesses of organization, obscure analysis and failure to accomplish the stated purpose of the article. However, the majority of the outside evaluations supported Professor Laborde's promotion to the rank of full professor.

### X.

While two of the requirements for promotion to full professorship were met by Professor Laborde—University service and teaching ability—it was the collective academic judgment of the University that

plaintiff lacked the third requirement for promotion—excellence in research and scholarship. I cannot say that the University's determination that Professor Laborde's scholarship as inadequate was unreasonable.[2] This Court is reluctant to substitute its judgment for the academic experts in the field, no matter now impressive her scholarly work appears to the Court. The crucial inquiry for the Court is and has been whether the decision not to promote the plaintiff was made without the influence of sex or national origin discrimination. I am unable to find any evidence that plaintiff's gender or national origin influenced the decision not to promote plaintiff to the rank of full professor.

### XI.

Plaintiff contends that she has had scholastic attainments equal to or better than her male counterparts holding the position of full professor in the Department of Humanities.

It appears that from the number of plaintiff's books and other publications that her output is greater than her fellow male professors. The irrefutable fact remains, however, that promotion within the halls of academia is not based on the quantity of scholarly works produced, but rather upon the quality of those works. The Court finds the weight of the evidence is that plaintiff's scholarship was inadequate, and although there was evidence to the contrary, I cannot say that the Department, the various committees and those bodies or individuals who reviewed the decision making process were unreasonable in reaching the conclusion that plaintiff should not be promoted. Excellence in scholarship is a significant and rational criterion in connection with the decision to promote. Obviously an instructor may have outstanding teaching skills

---

**2.** Plaintiff argues that she was wrongfully denied admission of certain confidential academic peer review records maintained by the University. These evaluation records, plaintiff asserts, would attest to plaintiff's scholarly qualifications for a 1979 promotion to full professor. One week before trial of this case and months after discovery was to be completed (February 1, 1979) under the local rules, plaintiff moved for discovery of her academic peer review file. The motion was heard at the time of trial. The Court unsuccessfully requested an explanation for the delay in seeking these files. Thereafter the Court offered plaintiff an in-camera inspection, but the plaintiff refused, seeking instead absolute examination of the files. The motion was then denied on the basis of untimeliness.

while lacking proficiency in scholarship. The University persuasively demonstrated that the failure to grant plaintiff her promotion was based on professional reasons unconnected with plaintiff's sex or national origin.

## XII.

Certain testimony and documentary evidence supported plaintiff's contention that the University has underutilized women in the areas of numbers employed, rates of pay, ladder rank positions and promotions for tenure. The School of Humanities, of which plaintiff's Department is a part, underutilizes women in the ladder ranks—full, associate and assistant professors. The 1975–77 affirmative action status report stated the Humanities program had the second highest female ladder rank headcount disparity. The report further noted that 61% of the female faculty members were at a nontenured level as opposed to 27% of the male ladder rank faculty members. Further, the Dean of the School of Humanities testified that, while the availability of women in the Humanities program is approximately 30%, only about 12% of those women have tenure. Thus on a purely statistical basis in the years 1975–1977 women faculty members were treated differently at Irvine University than their male counterparts.

## XIII.

Plaintiff complained of disparate treatment by having to teach Monday, Wednesday and Friday classes, and that such classes generally were grammar and composition courses. Since her research required her to travel to out-of-town libraries, Tuesday and Thursday classes were preferable to plaintiff. Course assignments are made by the Chairman of the Department. Upon hearing of plaintiff's scheduling complaints in 1976, the Chairman of the Department made a change in plaintiff's teaching schedule. Plaintiff further testified that she volunteered to teach at anytime and that she was a good teacher of language and grammar courses. Further, there was testimony

that native speakers bring a cultural richness and fluency to language and grammar courses; the practice of assigning native speakers to teach such courses occurs at other institutions of higher education. There is nothing discriminatory with this employment practice, under the facts proven.

## XIV.

Plaintiff alleges that she has been unlawfully discriminated against because she has never been offered the chairmanship of her Department while all other tenured male faculty members in the Department have, at various times, held that post. Further, plaintiff complains that she was not made Chairman of the Department nor paid as a Chairman during the years 1965–68 when, according to plaintiff, she performed all the duties of the post. Between 1965–68, Seymour Menton was the Chairman of the Department of Foreign Languages; at that time, there was simply a division of French and Italian. Thus, there was no Chairman since there was no Department of French and Italian. Since the establishment of the Department of French and Italian, it is clear that plaintiff did not have the support of other members of the Department regarding her appointment as Department Chairman.

## XV.

Plaintiff was Chief Academic Advisor in the years 1973–75; she believes that she should have held the title of Dean. However, plaintiff testified that she did not seek a different title while Chief Acadmic Advisor, nor did she seek greater pay. The person who succeeded to the work of Chief Academic Advisor was in fact an Associate Dean prior to assuming those functions and already had other responsibilities beyond those of a Chief Academic Advisor.

## XVI.

There was no evidence of any retaliation against plaintiff for support she may have

given Therese Lynn, another faculty member, for promotion to tenure.[3]

## XVII.

Although the plaintiff complains of improper solicitation of scholarly opinions from men, the testimony indicates quite clearly that a number of women were selected to review plaintiff's scholarship. It was the testimony of Vice Chancellor James L. McGaugh that women are appointed to Ad Hoc Review Committees when a woman is under review for promotion.

## XVIII.

Plaintiff claims that another member of the Department of French and Italian, who was a member of the editorial board of the University of California Press, influenced the Press' decision to deny publication of plaintiff's book. The documentation and testimony clearly showed that the member of the editorial board disqualified himself from review of the manuscript, participation in discussions and selection of extramural readers. Further, witnesses testified that there was no stigma attached to a denial of publication of a manuscript by the University of California Press.

## XIX.

Although plaintiff claims disparate treatment in being an Associate Professor Steps IV and V, there was testimony that there are also many men on the campus who have been Associate Professor Step IV longer than the normal period of service for review for promotion from Associate Professor to full professor. Further, there have been men reviewed for full professor from Associate Professor Step IV who have been denied promotion but received a merit increase to Associate Professor Step V.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter pursuant to Title VII of the Civil Rights Act of 1964, as amended. 42 U.S.C. § 2000e–5(f)(3). Title VII became applicable to defendant on March 24, 1972.

■ 2. Plaintiff filed charges with the EEOC on March 2, 1977. Plaintiff's claim for failure to be promoted in the 1973–74 academic year and failure to have the title of Associate Dean with commensurate pay as Chief Academic Advisor during the years 1973 and 1974 are barred under the 1964 Civil Rights Act inasmuch as plaintiff did not timely file a charge under this Act within 300 days after these allegedly unlawful employment practices occurred. 42 U.S.C. § 2000e–5(e). Further, plaintiff's claim with respect to failure to be recognized as Department Chairman during the years 1965–68 occurred at a time before Title VII was applicable to defendant.

3. Plaintiff has complied with the procedural requirements of 42 U.S.C. § 2000e–5(f) with regard to her claim of failure to be promoted to Full Professor during the 1975–76 academic year and thereafter.

4. The essence of plaintiff's claim is that the failure to promote plaintiff to the rank of Full Professor beginning with the academic year 1975–76 and years thereafter amounted to a violation of Title VII. 42 U.S.C. § 2000e–2(a)(1) states:

> (a) It shall be an unlawful employment practice for an employer—
>
> > (1) to fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

■ 5. To prevail in her action plaintiff must show that she is qualified for the

---

**3.** Not only does the Court make this finding, but also the Court assumes that since there was no reference whatsoever to the retaliation allegation in the post trial memoranda submitted by plaintiff's counsel, that plaintiff has abandoned this allegation as a ground for relief.

Furthermore, it is apparent plaintiff has abandoned other claims of discrimination which appear either in the complaint or were litigated at trial since they too are not addressed in the plaintiff's post trial proposed findings of fact and conclusions of law.

position she seeks and that regardless of her qualifications she was rejected on the basis of her sex or national origin. The U. S. Supreme Court has recently restated the burden of proof applicable in sex discrimination cases. Although vacating the First Circuit Court of Appeals' holding in *Sweeney v. Board of Trustees of Keene State College*, 569 F.2d 169 (1st Cir. 1978), the Court nonetheless approved the following standard set forth in *Sweeney*:

> . . . a plaintiff bears the initial burden of presenting evidence sufficient to establish a prima facie case of discrimination. The burden then shifts to the defendant to rebut the prima facie case by showing that a legitimate, nondiscriminatory reason accounted for its actions. If the rebuttal is successful, the plaintiff must show that the stated reason was a mere pretext for discrimination. The ultimate burden of persuasion on the issue of discrimination remains with the plaintiff, who must convince the court by a preponderance of the evidence that he or she has been the victim of discrimination.

*Sweeney, supra*, at 177; *See, Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 25 at 27, and n. 1 p. 25, 99 S.Ct. 295 at 296, 58 L.Ed.2d 216 (1975) (per curiam).

■ 6. It is well settled that statistics may be used to establish a prima facie case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); *International Brotherhood of Teamsters v. U. S.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1361 (D.Pa. 1977); *U. S. v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir. 1971).

■ The statistical evidence presented here establishes a prima facie case. The evidence established a shortage of women with respect to numbers on the faculty, academic rank, promotion to tenure, and salaries. Although plaintiff was unable to show open discrimination, in light of these statistics it would appear the employment policies followed by the University may unwittingly achieve an unlawful discriminato-

ry result. *See, Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

■ When plaintiff established a prima facie case of discrimination, the defendant had the duty to "articulate" legitimate nondiscriminatory reasons for its failure to promote plaintiff to the rank of Full Professor. Defendant met that burden. There was substantial evidence that Professor Laborde's scholarship was not of the quality expected of a Full Professor at Irvine University. The individuals comprising the committees for rank promotion were in the most advantageous position to assess plaintiff's scholarly qualifications. While the Court is not unmindful of its responsibility to provide a forum for litigation of discrimination complaints, it nevertheless must give cautioned deference to the judgments of faculty members. *Cussler v. University of Maryland*, 430 F.Supp. 602, 605–606 (D.Md. 1977).

The decision not to promote the plaintiff was made according to the procedures outlined in the University handbook. Plaintiff was given every consideration at each stage of decision-making and review.

7. Plaintiff contends that the presumptively valid reasons for non-promotion were a mere pretext for discrimination. The Court concludes, however, that the University's refusal to promote Professor Laborde to Full Professor was based on legitimate reasons and not because of her sex or national origin. Plaintiff has failed to convince the Court by a preponderance of the evidence that she was a victim of illegal discrimination. Plaintiff simply failed to prove she was qualified for promotion.

Since plaintiff failed in her proof to establish a violation of Title VII, plaintiff's claim for relief on all counts must be dismissed. The Clerk is directed to enter an order dismissing the complaint. Defendants may recover their costs from plaintiff.

APPENDIX

UNIVERSITY OF CALIFORNIA
PROCESS OF ACADEMIC PERSONNEL REVIEW

INCORPORATING RECOMMENDATIONS OF SPECIAL COMMITTEE ON PERSONNEL RECORDS

(APPLIES TO APPOINTMENTS AND PROMOTIONS TO TENURE AND TO APPRAISALS OF ASSISTANT PROFESSORS FOR RETENTION. CHART DOES NOT REFLECT CERTAIN VARIATIONS OF ADMINISTRATIVE STRUCTURE AMONG THE CAMPUSES.)

Underlined portions of text denote safeguards for candidate

**Recommendation Phase**

1. Personnel file. Information on candidate including confidential letters from extramural sources (nominated in part by candidate), evaluating:
   (i) teaching;
   (ii) research and creative work;
   (iii) professional activity;
   (iv) University and public service,
   the four areas reviewed for appointment, appraisal, and promotion, is collected by chairperson of department

2. Chairperson prepares review file for department's consideration, informs and counsels candidate about review process, and gives candidate opportunity to add information to file.

3. Department reviews case and makes recommendation for transmittal by chairperson to Deans and further authorities.

4. Chairperson prepares letter to Dean and indicates department's recommendation, reports vote and prepares independent appraisal, forwards with review file. Chairperson informs candidate of the tenor of departmental decision in the four areas, and of the vote. Candidate may submit response to department action; if in writing, response becomes part of file.

**Review Phase**

5. Dean receives review file and chairperson's letter; makes recommendation to Chancellor,

6. Chancellor's Office sends complete file to standing Budget (Personnel) Committee. On that Committee's nomination, Chancellor appoints confidential ad hoc committee which reviews file and reports to Chancellor

7. Chancellor's Office forwards ad hoc committee report to Budget Committee, which makes its recommendation to Chancellor on the basis of the full file, including ad hoc ctee report

**Decision Phase**

8. Chancellor receives:
   (i) departmental recommendation and chairperson's confidential letters,
   (ii) Dean's recommendation;
   (iii) ad hoc committee recommendation,
   (iv) Budget Committee recommendation;
   and makes decision, subject to Regental review in certain cases

9. On request of candidate, Chancellor prepares summary of aggregated reports together with reasons for decision.
   Before a final decision is made to terminate or not to reappoint Chancellor informs, with reasons, Dean and departmental chairperson, who informs candidate. Candidate and chairperson may respond in writing and include additional documentation.

**Appeal Phase**

10. Candidate may appeal to Senate Standing Privilege and Tenure Committee on grounds of procedural error or use of impermissible criteria.

11. Privilege and Tenure Committee investigates and may hold hearings, if appropriate. Committee has access to all pertinent material in file. Makes recommendation to Chancellor, with copy to candidate.

12. Chancellor reviews and acts on recommendation of Privilege and Tenure Committee. Candidate is informed of decision.

[C1864]